KHAMSONE KHAM NAOVARATH, Appellant, v.
THE STATE OF NEVADA, Respondent.

No. 18872

September 7, 1989                    779 P.2d 944

*Morgan D. Harris,* Public Defender, *Robert H. Thompson,* Deputy Public Defender, Clark County, for Appellant.

*Brian McKay,* Attorney General, Carson City; *Rex Bell,* District Attorney, *James Tufteland,* Chief Deputy District Attorney, *Robert Teuton,* Deputy District Attorney, Clark County, for Respondent.

## OPINION

By the Court, Springer, J.:

We have before us a thirteen-year-old seventh grader who stands convicted of an unspecified degree of murder by reason of his plea of guilty to an amended information charging "murder." Rejecting a pre-sentence recommendation of life with possibility of parole, the trial court sentenced appellant Naovarath to imprisonment for the rest of his life without possibility of parole.

Before proceeding we pause first to contemplate the meaning of a sentence "without possibility of parole," especially as it bears

upon a seventh grader. All but the deadliest and most unsalvageable of prisoners have the right to appear before the board of parole to try and show that they have behaved well in prison confines and that their moral and spiritual betterment merits consideration of some adjustment of their sentences. Denial of this vital opportunity means denial of hope; it means that good behavior and character improvement are immaterial; it means that whatever the future might hold in store for the mind and spirit of Khamsone Kham Naovarath, he will remain in prison for the rest of his days.[1] This is a severe penalty indeed to impose on a thirteen-year-old. The question is whether under the constitutions of Nevada and the United States this penalty is excessive, cruel or unusual.

This child committed a serious crime; he killed a man who had been molesting him sexually and then stole the man's belongings. Homosexual pornographic movies were found at the crime scene, and there is little doubt that if the homosexual child molester had not died from his injuries, he would be facing a possible life sentence himself and Naovarath would in all probability be free. All this aside, we do have before us a murder convict, and we must decide the issue presented by this appeal, namely, whether Naovarath's sentence of life imprisonment without possibility of parole is cruel or unusual under the prohibition of the state and federal constitutions.[2]

The department of probation and parole recommended a life sentence *with* possibility of parole. The sentencing judge, based on the record before her, concluded that Naovarath was "someone who had made it clear through his actions, his statements,

---

[1] The prosecutor pointed out to the sentencing judge that, if Naovarath were sentenced to life without the possibility of parole, he could still be free on parole someday if his sentence were to be commuted. It is true that if some unknown, future governor can garner the ratifying votes of a majority of the newly constituted board of pardons commissioners, it is *possible* that by an act of executive clemency Naovarath may not spend the rest of his days in a prison cell. We suppose that in light of this remote possibility Dante's fancied inscription on the gates of hell, "Abandon Hope All Ye Who Enter Here," may not be properly fastened above this boy's cell; nevertheless, for now, the sentence is unequivocal: life imprisonment, without parole—life ends in prison.

[2] In addition to this issue Naovarath has also assigned as error improper argument on the part of the prosecutor. Had Naovarath's sentence been the result of a jury verdict, we might be more inclined to be persuaded by this point. Naovarath claims that certain remarks of the prosecutor relative to parole eligibility improperly influenced the sentencing judge. It does not seem reasonable to suppose that the sentencing judge could have been influenced in any appreciable degree by the prosecutor's discussion of the subject of parole eligibility. We must and do assume that the sentencing judge was well aware of the consequences of her sentencing, and we decline to go into this matter any further.

and the testing that he is amoral, prone to aberrant behavior, and a danger to society. His acts speak for themselves."[3] The sentenc-

[3]One of the persuasive reasons why Naovarath's acts may not "speak for themselves" is that, in addition to Naovarath's being only thirteen years old and probably not yet in puberty (the record is silent on this) at the time of this event, his mental condition is brought into serious question by the psychologist's report found in the record. That Naovarath should not be completely removed from the possibility of future parole consideration and that he have an opportunity at some time in the future to be evaluated by a parole board, then, is supported by two considerations: first, Naovarath was at the time of the killing a child with the mind of a child, and second, Naovarath, insofar as the present state of the record is concerned, was psychotic, delusional and unable to "distinguish reality and fantasy." We, of course, do not know just how psychotic or delusional Naovarath was or is; we have in this record only the court-appointed psychologist's uncontradicted written opinion. It seems that little heed was paid by anyone to the psychologist's opinion and that no one ever sought a hearing on Naovarath's competency at the time of the killing or at the time of the plea of guilty of "murder."

Our putting "murder" in quotes prompts mention of another serious weakness in the proceedings in this case. As stated in the body of this opinion, Naovarath was convicted of an unspecified degree of murder. As far as the record before us is concerned, no mention is made of murder *in the first degree,* which is necessary in order to support the sentence of life without possibility of parole. The question is not raised by Naovarath's counsel in this appeal.

Further doubts about this conviction are created by Naovarath's presumed lack of capacity to commit a crime. When the legislature removed the crime of murder from the Juvenile Court Act, the common law of infancy was automatically restored. At common law a child under fourteen years is presumed to be incapable of committing a crime. Naovarath, at thirteen, is entitled to a presumption of incapacity. *See* LaFave and Scott, *Handbook of Criminal Law,* 351 (1972). According to NRS 194.010 "[c]hildren between eight years and fourteen years are presumed incapable of committing crimes unless there is clear proof that they knew of the act's wrongfulness at the time it was committed." The trial court apparently never considered this presumption of incapacity nor does it appear that counsel could have considered it while evaluating possible defenses or when judging Naovarath's capacity to enter a voluntary plea. The dissent does point out that Naovarath wrote a letter to his counsel and that, therefore, he must have been competent to plead; but, then, the dissent also maintains that Naovarath got a terrific deal when he pleaded guilty to the crime of murder because if he had not made a deal, he could very well have ended up with *two* life sentences without possibility of parole; whereas, now he enjoys the benefit of only having to serve one term of life imprisonment without possibility of parole.

In light of all this, and of the undisputed mental condition of Naovarath, it is hard to reconcile sound advocacy with the bargain struck here—a plea of guilty in exchange for the severest possible sentence. As stated, we are not in a position to deal with these matters now because the appeal does not raise them, and the record does not support further appellate inquiry at this time.

A reading of this record raises some additional troublesome questions that probably will have to be answered in a fact-finding, post-conviction proceeding.

The first question relates to the guilty plea. Expert opinion in the record tells us that Naovarath was psychotic, delusional, unable to "distinguish

ing judge is apparently saying that, in her judgment, the killing, taken together with the mental and moral status of the boy, render Naovarath, at thirteen, permanently unregenerate and an unreclaimable danger to society who must be caged until he dies. A reading of the very limited record before us suggests that the boy's acts do not necessarily "speak for themselves." Let us examine as closely as we can these acts and, more importantly, the thirteen-year-old who committed them:

Naovarath had known the man who was the object of his wrath for over a year and had been a visitor in his home, apparently for the purpose of indulging the sexual perversions of the deceased. On the day of the killing the deceased had, for reasons unknown, refused to admit Naovarath into his home. Naovarath entered the deceased's home on that day without permission. After gaining entry, by Naovarath's own account, the boy treated the man in a very cruel and degrading manner. Naovarath tipped over the man's wheelchair, threw a variety of objects at his head, taunted the man to kill himself and generally treated this helpless man in a most merciless fashion.

Let it not be thought that we are underestimating the gravity of this or other crimes committed by children. The undeniable increase in crimes by younger children has made it necessary for the criminal justice system to deal severely with young offenders. Our legislature has removed youthful murderers, whatever their age, from the grace of the juvenile court act, thus making the most severe adult penalties available, where appropriate, in the case of youthful murderers. Because, by statute, homicides committed by children even younger than Naovarath, for instance, ten or eleven year olds, are punishable by adult standards, careful judicial attention must be given to the subject of fair and constitutional treatment of children who find themselves caught up in the adult criminal justice system.

---

reality and fantasy" and suffering from a "substantial impairment of judgment." The plea canvass is not in the record, but one wonders whether such a child could possibly be capable, given his language difficulty and the apparent absence of his parents at critical stages of the proceedings, of understanding a plea negotiation which required him to plead guilty to murder, with the only issue being whether he should get a life sentence with or without possibility of parole.

The state of the record on the conviction itself is also of some concern. As stated above, the judgment of conviction makes no mention of the degree of the murder (except for citation of NRS 200.030, which merely recites that there are two degrees of murder, first degree and second degree). The judgment does not adjudicate Naovarath to be guilty of first degree murder and states only that the "Court did adjudge Defendant guilty" apparently referring to the "plea of guilty to the crime of murder between December 31, 1986 and January 7, 1987, committed in violation of NRS 200.010, 200.030."

In deciding whether the sentence in this case exceeds constitutional bounds it is necessary to look at both the age of the convict and at his probable mental state at the time of the offense.

Certainly there must be some age at which a sentence of this severity must be judged to be unarguably cruel and unusual. Had Naovarath been only nine or ten years old, few would argue that this kind of sentence could be properly allowed. Most agree that it would be excessive to sentence a nine or ten year old to life imprisonment without possibility of parole. Children of this age simply cannot be said to *deserve* this kind of severe punishment, nor can it be said that a child of such tender years is so unalterably bad that no parole release should ever be considered.

When a child reaches twelve or thirteen, it may not be universally agreed that a life sentence without parole should never be imposed, but surely all agree that such a severe and hopeless sentence should be imposed on prepubescent children, if at all, only in the most exceptional of circumstances. Children are and should be judged by different standards from those imposed upon mature adults. To say that a thirteen-year-old deserves a fifty or sixty year long sentence, imprisonment until he dies, is a grave judgment indeed if not Draconian. To make the judgment that a thirteen-year-old must be punished with this severity and that he can never be reformed, is the kind of judgment that, if it can be made at all, must be made rarely and only on the surest and soundest of grounds. Looking at the case before us from this perspective, we conclude that the sentence of life imprisonment without possibility of parole imposed upon Naovarath was cruel and unusual under the Nevada Constitution and the United States Constitution.

What means cruel and unusual punishment is not spelled out in either state or federal constitutions. Recently the United States Supreme Court in Thompson v. Oklahoma, 487 U.S. 815, 108 S.Ct. 2687, 2691 (1988), noted that

> [t]he authors of the Eighth Amendment drafted a categorical prohibition against the infliction of cruel and unusual punishments, but they made no attempt to define the contours of that category. They delegated that task to future generations of judges who have been guided by the "evolving standards of decency that mark the progress of a maturing society." Trop v. Dulles, 356 U.S. 86, 101, 78 S. Ct. 590, 598, 2 L.Ed. 2d 630 (1958) (plurality opinion) (Warren, C.J.).

Former United States Supreme Court Justice Frank Murphy, in an unpublished draft opinion, put the matter very well:

> More than any other provision in the Constitution the prohibition of cruel and unusual punishment depends largely, if

not entirely, upon the humanitarian instincts of the judiciary. We have nothing to guide us in defining what is cruel and unusual apart from our consciences. A punishment which is considered fair today may be considered cruel tomorrow. And so we are not dealing here with a set of absolutes. Our decision must necessarily spring from the mosaic of our beliefs, our backgrounds and the degree of our faith in the dignity of the human personality.[4]

What constitutes cruel and unusual punishment for a child presents an especially difficult question. Under Nevada statutory law, since 1985, a child may be charged, convicted and sentenced for murder. For all other purposes the defendant in this case, a child, a seventh grader at the time of the incident, is almost entirely legally incapacitated. A child may not vote; a child may not serve on a jury. A child may not drink or gamble; a child of Naovarath's age may not even drive an automobile. We may possibly have in the child before us the beginning of an irremediably dangerous adult human being, but we certainly cannot know that fact with any degree of certainty *now*. If putting this child away until his death is not cruel, it is certainly unusual. To adjudicate a thirteen-year-old to be forever irredeemable and to subject a child of this age to hopeless, lifelong punishment and segregation is not a usual or acceptable response to childhood criminality, even when the criminality amounts to murder.

As said, hopelessness or near hopelessness is the hallmark of Naovarath's punishment. It is questionable as to whether a thirteen-year-old can even imagine or comprehend what it means to be imprisoned for sixty years or more. It is questionable whether a sentence of virtually hopeless lifetime incarceration for this seventh grader "measurably contributes" to the social purposes that are intended to be served by this next-to-maximum penalty. Enmund v. Florida, 458 U.S. 782, 798 (1982).

Punishment by imprisonment is generally accepted as serving three moral and social purposes: retribution, deterrence of prospective offenders, and segregation of offenders from society.

Retribution has been characterized by the Supreme Court as being "an expression of society's outrage" at criminal conduct and as not being "inconsistent with our respect for the dignity of men." Gregg v. Georgia, 428 U.S. 153, 183 (1976). We do not question the right of society to some retribution against a child murderer, but given the undeniably lesser culpability of children for their bad actions, their capacity for growth and society's

---

[4]Unpublished draft opinion, Box 171, Harold Hitz Burton Papers, Library of Congress, *quoted in* D. Danelski, "The Riddle of Frank Murphy's Personality and Jurisprudence," 13 Law & Social Inquiry 196 (1988).

special obligation to children, almost anyone will be prompted to ask whether Naovarath *deserves* the degree of retribution represented by the hopelessness of a life sentence without possibility of parole, even for the crime of murder. We conclude that as "just deserts," for killing his sexual assailant, life without possibility of parole is excessive punishment for this thirteen-year-old boy.

Deterrence also has a rational and historically accepted legitimacy in determining the degree of punishment called for in a given criminal conviction. However, it is hard to claim that children of under fourteen years are really capable of being very much deterred by threatened punishment of this magnitude. Twelve and thirteen-year-olds just do not make the "kind of cost-benefit analysis that attaches any weight to the possibility" of future punishment. *Thompson,* 108 S.Ct. at 2700. Still, given the increase in capital crimes being engaged in by young people of Naovarath's age and even younger, very serious penalties may be properly invoked for crimes such as this.[5] One cannot help but wonder, however, if any thirteen-year-old children will be deterred from homicidal conduct by an appreciation of the difference between sentences of life with and life without the possibility of parole. Although general deterrence—sending out the word to a young but still sometimes dangerous population that homicides committed even by the very young are subject to very severe punishment—is certainly a legitimate purpose, it is highly doubtful that any twelve or thirteen-year-olds would be more deterred by the penalty imposed on this boy than by a life sentence which is reviewable by the parole board.

Segregation is not a frequently discussed aspect of the social purpose of imprisonment, but imprisonment, like the death sentence, does "get them off the streets"—it quarantines criminals, so to speak. Perhaps it is justifiable for courts to decree that thirteen-year-olds stay in prison until they die; probably not. It does not seem to us, from the record, that the trial judge had enough information to make the predictive judgment that this particular thirteen-year-old boy should never again see the light of freedom. A strong argument exists for the proposition that the parole board is best suited to make this kind of judgment at some future time. The need to segregate dangerous criminals does not justify locking this boy up for his whole life.

Naovarath's counsel is not here seeking a light sentence. His

---

[5]As far back as 1979, for example, children fourteen and under "committed a total of 206 homicides nationwide, more than 1,000 forcible rapes, 10,000 robberies and 10,000 aggravated assaults." *Thompson,* above, dissent of Scalia, J., 108 S.Ct. at 2715 (citing Hearings on S. 829 before the Subcommittee on the Criminal Law of the Senate Committee on the Judiciary, 98th Cong., 1st Sess., 551 (1983)).

counsel stipulates that life imprisonment is the minimum punishment that can be imposed in this case if the appeal is granted. The only question is whether it is necessary in order to punish Naovarath enough, or to deter others enough, or to segregate Naovarath long enough, that he must be kept behind bars with no hope, never to be free again. Probably some lesser degree of punishment, probably less fearful deterrence than hopeless lifetime incarceration, probably segregation for less than a lifetime would, in Naovarath's case, "contribute measurably" to the mentioned moral and social purposes of criminal sanctions without necessitating the horrific maximum sentence levied here.

Guided by the "humanitarian instincts" mentioned by Justice Murphy, we conclude that the kind of penalty imposed in this case is cruel and unusual punishment for this mentally and emotionally disordered thirteen-year-old child.[6] We therefore grant Naovarath's appeal and order that sentence be imposed against him for a term of life imprisonment with possibility of parole.

ROSE, J., concurs.

MOWBRAY, J., concurring:

I concur.

I agree that appellant Naovarath's sentence should be modified from life without the possibility of parole to life with the possibility of parole.

Thirteen-year-old Naovarath pleaded guilty to murdering thirty-eight-year-old David Foote and threw himself on the mercy of the court. While the facts are in dispute, Naovarath's statement, attached to the Pre-Sentencing Report prepared by the Department of Parole and Probation which was submitted to the sentencing judge prior to formal sentencing, states in part:

> The last time when I went over to his [Foote's] house to jack him off he told me to give him a blow job so I said no because I think it is desgusting [sic] we argue for a few minutes [sic]. Then I told him that I have to go home and he say no don't go so I got up and walk then he follow me and hit me with a stick. So I grabbed the back of the wheelchair and tipped it over and he fell down on the ground got up grabe [sic] his knife and came after me. So I took a glass jar and throw [sic] it at him and hit him in the head he strated [sic] to bleed I got so scared I diden't [sic] want to leave I was to [sic] scared to leave. . . .

---

[6] We relate this decision to the eighth amendment of the Constitution of the United States and article 1, section 6 of the Constitution of the State of Nevada, both of which proscribe cruel and unusual punishment.

Be that as it may, I do not accept Naovarath's explanation as an excuse for his crime. But it is a fact to be considered in the sentencing process.

The Pre-Sentencing Report in its final recommendation to the sentencing judge stated:

> RECOMMENDATION
>
> In addition to the $20 administrative assessment, it is recommended by the Department of Parole and Probation that the defendant, KHAMSONE KHAM NAOVARATH, be sentenced to a term of Life in the Nevada Department of Prisons, *with the possibility of parole.* (Emphasis added.)

The sentencing judge, however, chose to sentence Naovarath to a term of life *without* the possibility of parole.

Writing, of course, only for myself, it strikes me that such a sentence imposed on a thirteen year old boy under the facts presented reads like a sentence from a Charles Dickens' nineteenth century novel. Let me make myself crystal clear: I do not in any way approve of the boy's condemnable conduct nor of the crime he committed. But the boy is still a child of God and rather than being assigned to oblivion, a flicker of light should be kept alive in the hope that he may some time in the future be rehabilitated and become an acceptable member of society.

For these reasons I would reverse and remand the case with instructions to modify the sentence to life *with* the possibility of parole.

YOUNG, C. J., with whom STEFFEN, J., agrees, dissenting:

The district court imposed a sentence of life imprisonment without possibility of parole on a convicted murderer. The defendant, now age fifteen, was thirteen years old at the time of the crime.[1] We find that the sentence was constitutional, and did not evidence an abuse of discretion by the district court. Therefore, we would affirm.

During the morning of January 1, 1987, appellant, Khamsone Kham Naovarath, a thirteen year old native of Laos, decided to visit his neighbor, David Foote. Foote, a thirty-eight year old paraplegic confined to a wheelchair, refused to allow Naovarath to enter his home. However, Naovarath forced his way into the house, and during the next hour, slowly and brutally murdered the helpless David Foote.

Naovarath knocked Foote out of his wheelchair and tied him to a bench. He hit Foote on the head with glass bottles and jars

---

[1]Pursuant to NRS 62.050, criminal charges were filed against appellant in the district court. The juvenile courts of this state lack jurisdiction when the child is charged with murder or attempted murder.

which he found in the kitchen. Using foam carpet shampoo, he tried to poison or suffocate Foote. At one point he even encouraged Foote to kill himself with a kitchen knife. Finally, Naovarath stabbed Foote several times and strangled him with an electric cord. Naovarath then gathered some of Foote's valuables, and left the premises in Foote's van.

On January 6, 1987, Las Vegas police arrested Naovarath for Foote's murder. The following day, he confessed to the killing. Naovarath stated that he did not know why he killed Foote since the decedent had done nothing to harm him.

The majority opinion makes a number of unfounded and unsupported references to sexual abuse supposedly inflicted upon Naovarath by his wheelchair-bound victim. With little legal authority and scant factual underpinning to support his position, the appellant apparently feels compelled to cast aspersions upon a helpless victim. The appellant's descriptions of David Foote as a "homosexual child molester" and a "sexual assailant" are gross distortions of the record.

At his sentencing hearing, approximately one year after his confession, Naovarath's counsel *for the first time* claimed that, on several occasions, David Foote had shown pornographic films to Naovarath, then paid Naovarath to ejaculate him.[2] Moreover, on the day of the murder, Foote allegedly requested Naovarath to perform fellatio upon him. When Naovarath refused, Foote allegedly struck him. In retaliation, Naovarath knocked over Foote's wheelchair, sending Foote to the floor. Realizing he was in trouble, Naovarath decided to kill Foote. Naovarath stated that he omitted these incidents from his prior statements because he was ashamed of his homosexual acts.

However, although pornographic videotapes were found in the victim's home, the evidence does not demonstrate that Naovarath was the victim of sexual molestation. At the time of his confession, Naovarath told police that on the morning of the crime, he forced his way into David Foote's home,[3] unlikely conduct for one now raising the spectre of sexual abuse. By irresponsibly depicting David Foote as the villain in this case, instead of the victim, the majority opinion asserts as fact inferences which are, at best, highly speculative.[4]

---

[2]In his detailed confession, Naovarath said nothing about pornographic films or sexual advances by the victim. A year passed before he made those statements.

[3]To suggest, as does the majority, that Naovarath merely "entered the deceased's home on that day without permission" is to grossly understate the facts. Skidmarks from David Foote's wheelchair found in front of his door testify to the brute force used by Naovarath to enter the home and the futility of the victim's attempt to defend himself against his killer.

[4]We are especially disturbed by the majority's conclusion that "as 'just

Moreover, when Naovarath finally broached the subject of David Foote's alleged sexual misconduct, he described the paraplegic Foote getting up from the ground after being knocked out of his wheelchair, grabbing a knife and coming after Naovarath. Neither Naovarath nor his counsel ever explained how a severely handicapped man could display such physical dexterity. The victim's brother described David Foote as completely unable to defend himself. Therefore, we believe that Naovarath's belated self-serving explanation of the events surrounding David Foote's death invites disbelief.

Furthermore, Naovarath's unsupported claim of sexual abuse, made approximately one year after his confession and just before his penalty hearing, presented a question of credibility. It was within the district court's discretion whether to accept Naovarath's late-arriving defense or to discount it.[5] *See* Renard v. State, 94 Nev. 368, 369, 580 P.2d 470, 471 (1978) (vesting district courts with wide discretion regarding sentencing and probation). The credibility issue was understandably resolved against Naovarath. We should not overrule, as here, a district court's reasonable interpretation of the evidence presented at sentencing.

Finally, in view of the majority's great sympathy for the perpetrator of one of the most brutal murders in recent memory, and its unfounded and indefensible portrayal of the helpless victim, we feel compelled to remind the reader that paraplegic David Foote was the *victim* in this case, and Khamsone Naovarath the *offender*. For approximately an hour, Naovarath tortured David Foote to death. That much, at least, is clear from the record.

---

deserts' *for killing his sexual assailant,* life without possibility of parole is excessive punishment for this thirteen-year-old boy.'' (Emphasis added.) A careful review of the record produces no credible evidence to indicate the deceased was anything but a brutally murdered victim. To conclude that this helpless paraplegic was a ''sexual assailant'' is to proffer as a basis for the majority's argument what Winston Churchill might have called a ''terminological inexactitude.''

We are simply unwilling to be perceived, along with the sentencing judge, as jurists who are so calloused as to permit a thirteen-year-old who killed his ''sexual assailant'' to be consigned to life in prison. If the majority's characterization could be supported in the record, in our opinion the penalty sought by the majority (life with possibility of parole) would be unacceptably harsh. But facts are stubborn, and the good intentions and impassioned arguments of the majority cannot change them.

[5]The record contains a letter written by Naovarath to the district court shortly before his sentencing, asking the judge for leniency. Strangely, given the majority's reading of the record, Naovarath makes no mention of sexual abuse. Instead, he describes his homicidal behavior as an ''accident.''

*Naovarath pleaded guilty to murder.*[6] The majority implies that Naovarath received inadequate counsel during the plea bargain process because he eventually received a sentence of life imprisonment without possibility of parole.

However, the majority ignores the fact that the State originally charged Naovarath with murder with the use of a deadly weapon. Thus, Naovarath faced a sentence of two consecutive life terms with or without possibility of parole. NRS 193.165(1). Pursuant to his plea bargain, the State permitted him to enter a plea of guilty to an amended information charging him with murder, a felony. That charge exposed Naovarath to one sentence of life imprisonment with or without parole. NRS 200.030(4)(b). Therefore, contrary to the majority's view, Naovarath received a substantial concession from the State, as well as competent advocacy.

For two reasons, the majority claims that Naovarath lacked the capacity to enter into his plea bargain. First, because Naovarath was thirteen-years-old at the time of the murder, it suggests that Naovarath presumptively lacked the legal capacity to commit a crime. We find the majority's argument unsupportable in light of NRS 62.050, which strips juvenile courts of jurisdiction over minors charged with murder or attempted murder. Our statute applies the historical rule that the State should treat juveniles charged with capital crimes in every respect as adults. LeCroy v. State, 533 So.2d 750, 757 (Fla. 1988). Since Nevada tries children who commit heinous crimes, such as Naovarath, as adults, these violent young people clearly have the legal capacity to perform criminal acts.

Second, the majority contends that Naovarath was psychotic and delusional, and therefore incapable of voluntarily and intelligently pleading guilty. In Nevada, in order to competently enter a plea, a defendant must be of sufficient mentality to understand the nature of the criminal charges against him, and must be able to assist his counsel in his defense. NRS 178.400.

The record indicates that Naovarath possesses "superior intelligence." Moreover, in a letter addressed to the district court judge before his sentencing hearing, Naovarath indicated his understanding that, because he took David Foote's life, he faced a sentence of life imprisonment either with or without the possibility of parole. Thus, the evidence before us demonstrates that

---

[6]Although the majority claims that Naovarath pleaded guilty to an "unspecified degree of murder," the amended information relied upon by the majority declared that Naovarath "with malice aforethought, wilfully, feloniously and with premeditation" killed David Foote. Since NRS 200.030 defines first degree murder as any "kind of willful, deliberate and premeditated killing," we believe the record is clear that Naovarath pleaded guilty to first degree murder.

Naovarath was of sufficient mentality to understand the nature of the charges against him. Further, the record also contains a letter which Naovarath wrote to his public defender, describing the murder and his association with David Foote. Thus, Naovarath was able to assist his counsel in his defense.

Additionally, the majority contends that Naovarath's "language difficulty" prevented him from understanding his plea negotiation. However, as part of our review of the record, we viewed a videotape of Naovarath's confession to Las Vegas police investigators. We were impressed by Naovarath's dispassionate and articulate recitation of his killing of David Foote. The taped confession indicates that Naovarath possessed ample communication skills during his arrest and plea negotiation (and little remorse for his actions). Furthermore, at no time did the district court judge find cause to question Naovarath's competence. Therefore, the record belies the majority's contention that Naovarath was not competent to enter into his plea bargain. Moreover, if the majority truly believed their conclusions of incompetence on the part of Naovarath to enter a plea, it is logically and legally inconsistent to impose any degree of punishment pursuant to a plea entered by a mentally incompetent defendant.

After consideration of all of the evidence, including the results of a psychological examination, the district court sentenced Naovarath to life in prison without possibility of parole. On appeal, Naovarath seeks a reduction of his sentence to life imprisonment with possibility of parole.

First, Naovarath argues that the prosecutor's closing remarks at the sentencing hearing were inaccurate and improperly influenced the district court. The prosecutor cited statistics showing that most crimes are committed by males between the ages of nineteen and twenty-eight. He noted that with a sentence of life imprisonment with possibility of parole, Naovarath would be parole eligible at age twenty-three.[7] In comparison, the prosecutor observed that under a sentence of life imprisonment without possibility of parole, Naovarath could not anticipate release from prison until age thirty-four at the earliest.[8]

---

[7]NRS 200.030(4) provides in part:

Every person convicted of murder of the first degree shall be punished:

. . . .

(b) . . . by imprisonment in the state prison for life with or without possibility of parole. If the penalty is fixed at life imprisonment with possibility of parole, eligibility for parole begins when a minimum of 10 years has been served.

[8]NRS 213.1099(3) provides:

Except as otherwise provided in NRS 213.1215, the board may not

Naovarath contends that the prosecutor's argument placed undue pressure upon the sentencer and did not accurately reflect the sentencing statutes. We disagree. The prosecutor merely integrated the facts of the instant case with the statutory provisions for parole. Under a sentence of life imprisonment with possibility of parole, Naovarath would be eligible for release at age twenty-three, after ten years incarceration. NRS 200.030(4). Applying a sentence of life imprisonment without possibility of parole, Naovarath could receive parole after twenty years in prison, provided that the state board of pardons commissioners modifies his sentence to life imprisonment with possibility of parole.

No evidence exists to support Naovarath's contention that the prosecutor's comments unduly influenced the district court. We have faith that the district court judge was familiar with the possible penalties for first degree murder, as well as the pardon process and its effect on prison terms. When the sentence is within the statutory limits and there has been no proof of judicial reliance upon "impalpable or highly suspect evidence," this court will not interfere with the district court's imposition of sentence. Lloyd v. State, 94 Nev. 167, 170, 576 P.2d 740, 742 (1978).

Next, Naovarath argues that the sentence of life imprisonment without parole was disproportionate, and violated the Eighth Amendment's ban on cruel and unusual punishment. Again, we disagree.

Aside from capital cases, successful challenges to the proportionality of particular sentences are extremely rare. Solem v. Helm, 463 U.S. 277, 289-90 (1983). Reviewing courts should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punish-

---

release on parole a prisoner whose sentence to death or to life without possibility of parole has been commuted to a lesser penalty unless it finds that the prisoner has served at least 20 consecutive years in the state prison, is not under an order that he be detained to answer for a crime or violation of parole or probation in another jurisdiction, and that he has no history of:

(a) Recent misconduct in the institution, and that he has been recommended for parole by the director of the department of prisons;

(b) Repetitive criminal conduct;

(c) Criminal conduct related to the use of alcohol or drugs;

(d) Repetitive sexual deviance, violence or aggression; or

(e) Failure in parole, probation, work release or similar programs.

Although Naovarath was fourteen at the time of sentencing, the district court granted him 374 days credit for time already served. Thus, the prosecutor miscalculated. Assuming that he received a commutation, a sentence of life imprisonment without possibility of parole would make Naovarath parole eligible at age thirty-three.

ments for crimes. *Solem,* 463 U.S. at 290. Moreover, we owe the same deference to the discretion that trial courts possess in sentencing convicted criminals. *Id.*

*Solem* defined three objective factors for Eighth Amendment proportionality analysis. *Id.* at 290-292. First, courts must consider the gravity of the offense and the harshness of the penalty. In the instant case, Naovarath committed the gravest of all crimes, murder, in an extraordinarily brutal manner. For his conduct, Naovarath received the most severe penalty constitutionally permitted by our legal system. *See* Thompson v. Oklahoma, 487 U.S. 815, 108 S.Ct. 2687 (1988) (holding that courts may not impose the death penalty on murderers who commit their crimes while under the age of sixteen).

Second, we must compare the sentences imposed on other criminals in the same jurisdiction. In Harvey v. State, 100 Nev. 340, 682 P.2d 1384 (1984), a jury sentenced a sixteen year old murderer to death for the fatal shooting of a security guard. The defendant shot the guard in a panic while fleeing a robbery. *Id.* at 343, 682 P.2d at 1386.

Holding that capital punishment was disproportionate to the penalty imposed in Nevada in similar cases, this court substituted Harvey's death sentence with a penalty of life imprisonment without possibility of parole. *Id.* at 344, 682 P.2d at 1387. We held that because Harvey shot the guard in a panic, his crime lacked the degree of heinousness and brutality evidenced in many cases in which the death penalty was imposed. *Id.* at 342, 682 P.2d at 1385. Moreover, we noted that Harvey suffered from extreme mental or emotional problems when he committed the murder. *Id.* at 343, 682 P.2d at 1386.

In the case at hand, Naovarath was thirteen years old when he killed David Foote. Although younger than the defendant in *Harvey,* Naovarath's crime was notable for its cruelty. Naovarath always had the option to leave Foote's house. Instead, he chose to stay and inflict horrible suffering upon his helpless victim. Like Harvey, Naovarath also labored under psychological problems. Thus, in accordance with our decision in *Harvey,* it seems reasonable to sentence Naovarath to life imprisonment without possibility of parole.

Third, we must compare sentences imposed for commission of the same crime in other jurisdictions. In a number of states, courts may try and punish juveniles as adults for certain offenses.[9]

---

[9]In Idaho, the state may try 14 year old murder suspects as adults. Idaho Code § 16-1806 (1988). In Illinois, children 15 or older may be tried as adults for murder, criminal sexual assault, armed robbery with a firearm, and possession of a deadly weapon in a school. Ill. Ann. Stat. ch. 37, § 805-4(6) (Smith-Hurd Supp. 1988). In Indiana, removal from juvenile to district court is mandatory when a child is 10 or older and charged with murder. Ind. Code

For example, in New Jersey, if convicted of murder in criminal court, a juvenile receives a minimum sentence of thirty years without parole. N.J.Stat.Ann. § 2C:11-3b (West Supp. 1988).

In *Thompson v. Oklahoma*, 487 U.S. 815, 108 S.Ct. 2687 (1988), the Supreme Court vacated the death sentence imposed upon an Oklahoma juvenile who committed first degree murder at the age of fifteen. According to Oklahoma law, a person convicted of first degree murder shall be punished by death or life imprisonment. Okla.Stat.Ann.tit. 21, § 701.9 (West Supp. 1988). Since the Supreme Court ruled that the death penalty was unconstitutional in the case of murderers under the age of sixteen, Thompson now faces lifetime incarceration. In *Eddings v. State*, 688 P.2d 342 (Okla.Crim.App. 1984), the Oklahoma Court of Criminal Appeals imposed the same sentence on a sixteen year old killer.

In *Postell v. State*, 383 So.2d 1159 (Fla.Dist.Ct.App. 1980), a thirteen year old girl was convicted of second degree murder, burglary and robbery. The court imposed concurrent ninety-nine-year terms for the murder and burglary and a consecutive fifteen-year term for the robbery. *Id.* at 1160 n. 1.[10]

In *Whitehead v. State*, 511 N.E.2d 284 (Ind. 1987), the Indiana Supreme Court upheld a fifty-four year sentence imposed

---

Ann. § 31-6-2-4(b)(d) (Michie Supp. 1987). Kentucky maintains a removal age of 14 for juveniles charged with capital offenses or Class A or Class B felonies. Ky. Rev. Stat. Ann. §§ 635.020(2)-(4), 640.010 (Michie Supp. 1988). Minnesota makes removal mandatory for offenses committed by children 14 years or older who were previously certified for criminal prosecution and convicted of the offense or a lesser included offense. Minn. Stat. § 260.125 subd. 1, 3, and 3a (1986). Montana has lowered its removal age from 16 to 12 for children charged with sexual intercourse without consent, deliberate homicide, mitigated deliberate homicide, or attempted deliberate homicide or attempted mitigated deliberate homicide. Mont. Code Ann. § 41-5-206(1)(a) (1987). In New Jersey, 14 year-olds charged with certain aggravated offenses are now tried and punished as adults. N.J.Stat.Ann. § 2A:4A-26 (West Supp. 1987). New York recently amended its law to allow certain 13, 14, and 15 year-olds to be tried and punished as adults. N.Y.Crim.Proc. Law § 190.71 (McKinney 1982).

Furthermore, federal law now holds that juveniles above the age of fifteen who are charged with violent felonies or certain drug offenses may be transferred from the jurisdiction of the juvenile court to an appropriate district court of the United States for criminal prosecution. 18 U.S.C. § 5032 (1984).

[10]*Postell* has been criticized insofar as it held that the defendant (who was charged by grand jury indictment) was ineligible for classification as a youthful offender, and thus, subject to the more severe adult penalties. *See* State v. Goodson, 403 So.2d 1337, 1339 (Fla. 1981) (holding that indicted juveniles may be subject to classification as youthful offenders). However, the Florida Supreme Court never specifically overturned *Postell*.

upon a juvenile who brutally beat a pregnant woman to death. The court noted a number of aggravating factors also present in the instant case: the State's psychiatrist felt that the defendant needed long term psychological counseling; the crime was particularly gruesome; a reduced sentence would depreciate the seriousness of the crime, and there was no excuse or provocation to justify the defendant's attack upon the victim. *Id.* at 296.

Thus, a number of states besides Nevada now enforce severe penalties on youthful murderers.[11] Consequently, we believe that Naovarath's sentence of life imprisonment without possibility of parole was not disproportionate to his offense. Moreover, the *Solem* decision left intact the authority pronounced but three years earlier by the same Court in the case of Rummel v. Estelle, 445 U.S. 263 (1980). In *Rummel,* the Court declared:

> [g]iven the unique nature of the punishments considered in *Weems* [Weems v. United States, 217 U.S. 349 (1910) involving the unique punishment of *cadena temporal* imposed by the Philippine Code] and in the death penalty cases, one could argue without fear of contradiction by any decision of this Court that for crimes concededly classified and classifiable as felonies, that is, as punishable by significant terms of imprisonment in a state penitentiary, the length of the sentence actually imposed is purely a matter of legislative prerogative.

*Id.* at 274. Naovarath's sentence was within the limits specified by the Nevada legislature and should not be overturned by this court.

Lastly, Naovarath argues that his sentence is cruel and unusual punishment and therefore violates the Eighth Amendment. He contends that the murder victim, David Foote, provoked his own demise by subjecting the thirteen year old Naovarath to sexual abuse. Furthermore, Naovarath argues that the wartime violence he witnessed as a small child in Laos and Vietnam should mitigate his sentence.

Again, Naovarath's claims lack merit. Three basic tests exist for evaluating whether a punishment is cruel or unusual:

> (1) In view of all the circumstances, is the punishment of such character as to shock the conscience and to violate principles of fundamental fairness? (2) Is the punishment greatly disproportionate to the offense? (3) Does the punish-

---

[11]Recently, in Stanford v. Kentucky, 57 U.S.L.W. 4973 (1989), the Supreme Court held that the imposition of capital punishment on persons who murder at sixteen or seventeen years of age does not offend the Eighth Amendment's prohibition against cruel and unusual punishment.

ment go beyond what is necessary to achieve the aim of the public interest as expressed by the legislative act?

Workman v. Commonwealth, 429 S.W.2d 374, 378 (Ky.Ct.App. 1968).

After consideration of all of the circumstances of this case, we do not find that the sentence imposed shocks the conscience or violates principles of fairness. Although Naovarath was only thirteen at the time of the murder, the psychiatrist who examined him estimated that Naovarath had a mental age of seventeen. Naovarath understood the difference between right and wrong, yet, after the brutal killing, he expressed no remorse for his actions other than how this crime will affect the remainder of his life.

As stated above, the district court's sentence of life imprisonment without possibility of parole was not disproportionate to Naovarath's offense. Therefore, our final question is whether this punishment serves any of the goals of our penal legislation.

Our legislature implemented tough penalties for first degree murderers as a means of dealing with dangerous and incorrigible individuals who would be a constant threat to society. The psychiatrist who examined Naovarath stated that his conscience is "non-developed, if not amoral." Moreover, the physician observed evidence of a developing psychosis. The rage and randomness of Naovarath's conduct during the murder is tragic evidence of the danger which he poses to society.

Nothing in Naovarath's background serves to mitigate this impression or indicates a potential for rehabilitation. He admitted to drug and alcohol abuse, as well as involvement with street gangs. Juvenile records indicate that he is an habitual liar, had a poor school attendance record, and took part in no constructive activities at home or in the community.

We are unmoved by Naovarath's contention that his tender years entitle him to special consideration at sentencing. As described above, we appear to be witnessing a national trend toward the reduction of the age of juvenile criminal liability. Persons under eighteen commit approximately twenty percent of violent crimes and forty-four percent of serious property crimes. Hearings on S. 829 before the Subcommittee on Criminal Law of the Senate Committee on the Judiciary. 98th Cong., 1st Sess., 551 (1983).

In 1979, children under the age of fifteen committed 206 homicides, over 1,000 forcible rapes, and more than 10,000 robberies and 10,000 cases of aggravated assault. *Id.* at 554 (citing the United States Department of Justice, *Sourcebook of Criminal Justice Statistics 1981*). Many of these juveniles are

cynical, street-wise, repeat offenders, and are indistinguishable, except for their age, from their adult criminal counterparts. *Id.* at 551.

Traditionally, our juvenile system followed the premise that rehabilitation should be its primary function. However, when applied to the most serious youthful offenders of today, that vision fails to adequately protect the public interest. *Id.* at 543. We recognize that juvenile offenders have special needs. However, we also recognize our responsibility to protect the public from violent crime and to hold young people accountable for their actions when, as in the case at hand, they engage in particularly heinous conduct.

In the instant case, the sentence of life imprisonment without possibility of parole was necessary to accomplish the objective of protecting society and to achieve the related goals of deterrence, rehabilitation and retribution. Thus, it was clearly within the purposes envisioned by the Nevada legislature.

The sentence imposed on Naovarath by the district court was within the statutory limits. Moreover, the penalty was not disproportionate to his offense, nor was it cruel and unusual punishment. Accordingly, we would affirm the decision of the district court.