## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

May 27 2015, 8:56 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Kimmerly A. Klee
Greenwood, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Ellen H. Meilaender
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Dominique Hamler,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | May 27, 2015<br><br>Court of Appeals Cause No.<br>49A02-1407-CR-452<br><br>Appeal from the Marion Superior Court<br>Cause No. 49G04-1211-MR-80841<br><br>The Honorable Lisa Borges, Judge |

**Barnes, Judge.**

# Case Summary

Dominique Hamler appeals his convictions and sentence for murder, Class A felony attempted murder, Class B felony robbery, and Class B felony criminal confinement. We affirm.

# Issues

The issues before us are:

I. whether Hamler's convictions for murder, attempted murder, and Class B felony robbery violate double jeopardy; and

II. whether Hamler's aggregate 140-year sentence is inappropriate.

# Facts

On November 15, 2012, Thomas Keys, an Indianapolis DJ, called Marvin Finney and asked him to help record a mix tape in memory of a local rapper named "Bango." Tr. p. 128. Bango had been shot and killed about a week earlier. Hamler was best friends with Bango and also referred to him as a "brother." *Id.* at 150. On this date, Hamler was nineteen and would turn twenty in two weeks.

On that same afternoon, Hamler was having his hair braided at his father's house when Nathaniel Armstrong and James McDuffy came to the house. Armstrong said, "We gonna get 'em," and Hamler left with Armstrong and McDuffy. *Id.* at 246. Hamler and Armstrong were overheard at another house having a conversation in which one of them said they were going to "get the

motherf***ers" who had killed Bango. *Id.* at 406. A couple hours later, Armstrong returned to the house, grabbed some guns, and stated, "We found the motherf***ers," before leaving again. *Id.* at 409.

[5] At about 5:00 p.m., Finney and Keys arrived at a music studio operated by Carlton Hart in Indianapolis to work on the mix tape for Bango. They were let into the studio by Dontee Robinson and led into a room where McDuffy and an unidentified man with "Asian eyes" were waiting for them. *Id.* at 137. Robinson and McDuffy began asking Finney and Keys who killed Bango and insinuating that Keys knew who had killed him. Keys denied having any knowledge about the murder. McDuffy then pulled out a handgun, and Robinson pulled out an assault rifle. McDuffy and Robinson patted down Finney and Keys, removed the belongings from their pockets, and told Finney and Keys that they would not be going home if they did not disclose what they knew about Bango's murder.

[6] At this point, Hamler walked into the room, appearing very aggressive and mad. He pointed an assault rifle at Finney and Keys and yelled, "Which one of you all killed my brother, Bango?" *Id.* at 150. Not receiving a satisfactory response, Hamler then said, "Why they ain't tied up yet?" *Id.* at 151. Hamler and McDuffy then punched Finney, who was then tied up with zip ties by the man with "Asian eyes." Keys also was punched and kicked to the ground and tied up with zip ties. Hamler and McDuffy continued questioning Finney and Keys; Hamler also demanded that Finney unlock his phone so Hamler could see with whom he had been communicating.

[7]     At some point, Armstrong and a second unidentified man, who was bald, came into the room. Armstrong took a box cutter and sliced Keys's leg with it. After Armstrong and the bald man came into the room, Finney heard someone say, "We're doing this for Bango. We don't care if you all got something to do with it or not. Somebody got to pay." *Id.* at 158. Armstrong then told McDuffy to duct tape Finney's and Keys's mouths shut, and he did so. The group also placed zip ties tightly around Finney's and Keys's necks. Hamler, Robinson, Armstrong, and the bald man left the room to get gloves and "finish it off." *Id.* at 162. When these four returned to the room wearing work gloves, the bald man began discussing various ways they could kill Finney and Keys. There was continued discussion of whether Finney and Keys knew who had killed Bango, and the need to "do this for Bango," while Bango's music played in the background. *Id.* at 166.

[8]     Finally, the lights were turned off, Finney and Keys were left in the room, while the other six men—Hamler, McDuffy, Robinson, Armstrong, and the two unidentified men—left. Then, one of the men returned to the room. Finney could not identify who had returned and could only say that he was wearing black and had dreadlocks; this could have described either Hamler or Robinson. This person then began shooting at both Finney and Keys. Keys was shot and killed, while Finney was shot in both wrists and played dead. Afterwards, Finney managed to flee from the studio and seek help at a nearby drugstore at approximately 8:00 p.m.

[9] Hamler, Armstrong, and McDuffy returned to Hamler's father's house. Hamler, who was sweaty and appeared nervous, gave his father a handgun "to put up." *Id.* at 247. Armstrong also returned to the other house he had been at earlier and said that "We got the motherf***ers" and that they bound the victims with duct tape, "worked them over," shut off the lights, and then opened fire. *Id.* at 410-11.

[10] The State charged Hamler with murder, felony murder, Class A felony attempted murder, Class A felony robbery, Class B felony criminal confinement, and Class B felony conspiracy to commit criminal confinement. The robbery count alleged both that Hamler had been armed with a deadly weapon and that the robbery had resulted in serious bodily injury to Keys and Finney. At trial, the jury was instructed that the offense of robbery is a Class B felony if it is committed while armed with a deadly weapon and that it was required to find that Hamler had been armed with a deadly weapon. The jury found Hamler guilty as charged. However, the trial court did not enter judgments of conviction for felony murder or conspiracy to commit criminal confinement. It also entered judgment for robbery as a Class B felony instead of a Class A felony. It imposed sentences of sixty-five years for murder, fifty years for attempted murder, ten years for robbery, and fifteen years for criminal confinement, all to be served consecutively for a total sentence of 140 years. Hamler now appeals.

# Analysis

## *I. Double Jeopardy*

[11] Hamler first contends his conviction for robbery must be reduced to a Class C felony because of double jeopardy concerns, given his convictions for murder and attempted murder. Under Article 1, Section 14 of the Indiana Constitution, "'[T]wo or more offenses are the "same offense" . . . if, with respect to *either* the statutory elements of the challenged crimes *or* the actual evidence used to convict, the essential elements of one challenged offense also establish the essential elements of another challenged offense.'" *Cross v. State*, 15 N.E.3d 569, 571 (Ind. 2014) (quoting *Richardson v. State,* 717 N.E.2d 32, 49 (Ind. 1999) (emphasis in original) (footnote omitted)). Under the *Richardson* "actual evidence" test, the Indiana Double Jeopardy Clause is not violated if "the evidentiary facts establishing the essential elements of one offense also establish only one or even several, but not all, of the essential elements of a second offense." *Spivey v. State*, 761 N.E.2d 831, 833 (Ind. 2002). In addition to the "actual evidence" test, there are "'a series of rules of statutory construction and common law that supplements the constitutional protections'" outlined in *Richardson*. *Cross*, 15 N.E.3d at 571 (quoting *Miller v. State*, 790 N.E.2d 437, 439 (Ind. 2003)). One such rule "prohibit[s] conviction and punishment 'for an enhancement of a crime where the enhancement is imposed for the *very same behavior* or harm as another crime for which the defendant has been convicted and punished.'" *Miller*, 790 N.E.2d at 439 (quoting *Richardson,* 717 N.E.2d at 56 (Sullivan, J., concurring)). Hamler's argument that his

conviction for Class B felony robbery causes a double jeopardy conflict with his convictions for murder and attempted murder arises from this particular rule.

[12] At the time of the crime, in order to elevate robbery from a Class C to a Class B felony, the State was required to prove either that it was committed while armed with a deadly weapon or resulted in bodily injury to anyone other than a defendant. Ind. Code § 35-42-5-1 (2012). Robbery was elevated to a Class A felony if it resulted in serious bodily injury to anyone other than a defendant.[1] *Id.* Hamler claims that the bodily injuries to Finney and Keys established both his convictions for murder and attempted murder and also established a bodily injury enhancement to make the robbery a Class B felony. He relies upon *Williams v. State*, 757 N.E.2d 1048 (Ind. Ct. App. 2001), *trans. denied*. In that case, the defendant was convicted of both attempted murder and Class A felony robbery based upon shooting the victim in the head. The majority in *Williams* held that the robbery conviction had to be reduced to a Class C felony because there was no evidence of any other injuries presented other than the shot to the head that occurred as part of the robbery. *Williams*, 757 N.E.2d at 1070. Judge Baker dissented on this issue, believing that the robbery conviction only had to be reduced to a Class B felony and stating, "Because Williams was armed with a deadly weapon, double jeopardy protections do not prohibit convicting

---

[1] The trial court reduced Hamler's Class A felony robbery conviction to a Class B felony to avoid conflict with the serious bodily injuries sustained by Finney and Keys as supported the murder and attempted murder convictions.

Williams of class-B-felony robbery and attempted murder." *Id.* at 1070 (Baker, J., dissenting).

[13] After *Williams* was decided, our supreme court issued opinions consistent with Judge Baker's dissent. In *Gross v. State*, 769 N.E.2d 1136 (Ind. 2002), the defendant was convicted of both murder and Class A felony robbery when he shot and killed the robbery victim. The court agreed that the Class A felony robbery conviction could not stand but ordered that it be reduced to a Class B felony, not a Class C felony. Specifically, the court noted that the State had charged the defendant "with both the bodily injury variety of Class B felony robbery as well as the armed with a deadly weapon variety of the offense." *Gross*, 769 N.E.2d at 1139. Additionally, the jury had been instructed on both varieties of Class B felony robbery. *Id.* at 1139-40. Under these circumstances, the court held that it was appropriate to reduce the robbery conviction to a Class B felony. *See also Robinson v. State*, 775 N.E.2d 316, 320 (Ind. 2002) (holding there was no double jeopardy conflict between convictions for murder and Class B felony robbery because jury was instructed to it had to find defendant committed robbery while armed with a deadly weapon).

[14] Here, as in *Gross*, the State's charging information for robbery expressly alleged both that Finney and/or Keys suffered serious bodily injury, and that Hamler was armed with a deadly weapon. The jury likewise was instructed on the robbery charge that it had to find Hamler was armed with a deadly weapon. As such, there is no double jeopardy conflict between Hamler's convictions for murder and attempted murder, based upon Keys's and Finney's injuries, and

Class B felony robbery, based upon Hamler's use of a deadly weapon. *See Gross*, 769 N.E.2d at 1139-40. We affirm Hamler's conviction for Class B felony robbery.

## *II. Sentence*

Hamler also contends that his aggregate 140-year sentence is inappropriate under Indiana Appellate Rule 7(B) in light of the nature of the offenses and his character. Although Rule 7(B) does not require us to be "extremely" deferential to a trial court's sentencing decision, we still must give due consideration to that decision. *Rutherford v. State*, 866 N.E.2d 867, 873 (Ind. Ct. App. 2007). We also understand and recognize the unique perspective a trial court brings to its sentencing decisions. *Id.* "Additionally, a defendant bears the burden of persuading the appellate court that his or her sentence is inappropriate." *Id.*

The principal role of Rule 7(B) review "should be to attempt to leaven the outliers, and identify some guiding principles for trial courts and those charged with improvement of the sentencing statutes, but not to achieve a perceived 'correct' result in each case." *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008). We "should focus on the forest—the aggregate sentence—rather than the trees—consecutive or concurrent, number of counts, or length of the sentence on any individual count." *Id.* Whether a sentence is inappropriate ultimately turns on the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case. *Id.* at 1224. When reviewing the appropriateness of a sentence under Rule 7(B), we may consider all aspects of the penal consequences

imposed by the trial court in sentencing the defendant, including whether a portion of the sentence was suspended. *Davidson v. State*, 926 N.E.2d 1023, 1025 (Ind. 2010).

[17] Hamler relies primarily upon two cases in arguing that his sentence is inappropriate: *Fuller v. State*, 9 N.E.3d 653 (Ind. 2014), and *Brown v. State*, 10 N.E.3d 1 (Ind. 2014). These companion cases, decided on the same day by our supreme court, concerned young co-defendants in a double murder-robbery. Fuller, who was fifteen, and Brown, who was sixteen, acted in concert with a third teenager, an eighteen-year-old, in committing a home robbery in which two victims were shot and killed. Fuller was one of the actual shooters of the victims while Brown was only an accomplice. The teenagers robbed the victims of several thousand dollars, a large quantity of marijuana, and several other items, and then went on a shopping spree with the cash. After Fuller and Brown each were convicted as adults of two counts of murder and one count of Class B felony robbery, the trial court imposed aggregate sentences of 150 years for each of them and their eighteen-year-old co-defendant.

[18] Our supreme court decided that 150 years was inappropriate for Fuller and Brown, revising Fuller's sentence to a total of eighty-five years and Brown's to eighty years. *Fuller*, 9 N.E.3d at 659; *Brown*, 10 N.E.3d at 8.[2] The court found that, although the offenses were "senseless and reprehensible," there was

---

[2] Our supreme court imposed a slightly longer sentence upon Fuller because he actually shot the victims while Brown did not. *Fuller*, 9 N.E.3d at 659.

nothing "particularly heinous" about them, noting "there is no evidence that the victims were tortured, beaten, or lingered in pain." *Brown*, 10 N.E.3d at 5. The court then discussed the young age of the defendants at length with respect to their character. It stated, "We take this opportunity to reiterate what the United States Supreme Court has expressed: Sentencing considerations for youthful offenders—particularly for juveniles—are not coextensive with those for adults." *Id.* at 6 (citing *Miller v. Alabama*, -- U.S. --, 132 S. Ct. 2455, 2469 (2012)). It acknowledged the Supreme Court's "general recognition that juveniles are less culpable than adults and therefore are less deserving of the most severe punishments." *Id.* at 7 (citing *Graham v. Florida*, 560 U.S. 48, 68, 130 S. Ct. 2011, 2026 (2010)). There are at least three reasons for this. First, "juveniles have a 'lack of maturity and an underdeveloped sense of responsibility.'" *Graham*, 560 U.S. at 68, 130 S. Ct. at 2026 (quoting *Roper v. Simmons*, 543 U.S. 551, 569, 125 S. Ct. 1183, 1195 (2005)). Second, "they 'are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure.'" *Id.* at 68, 130 S. Ct. at 2026 (quoting *Roper*, 543 U.S. at 569, 125 S. Ct. at 1195). Juveniles also "have limited 'contro[l] over their own environment' and lack the ability to extricate themselves from horrific, crime-producing settings." *Miller*, 132 S. Ct. at 2464 (alteration in original) (quoting *Roper*, 543 U.S. at 569, 125 S. Ct. at 1195). Third, "a child's character is not as 'well formed' as an adult's . . . and his actions [are] less likely to be 'evidence of irretrievabl[e] deprav[ity].'" *Id.* (alteration in original) (quoting *Roper*, 543 U.S. at 570, 125 S. Ct. at 1195).

[19]     Our supreme court also noted other cases in which it had reduced sentences based in part on a defendant's youth, including: *Carter v. State*, 711 N.E.2d 835, 836-37 (Ind. 1999) (reducing fourteen-year-old's maximum sentence for murder); *Walton v. State*, 650 N.E.2d 1134, 1135, 1137 (Ind. 1995) (reducing sixteen-year-old's maximum double-murder sentence); *Widener v. State*, 659 N.E.2d 529, 530 (Ind. 1995) (reducing seventeen-year-old's sentence for murder-robbery). *Brown*, 10 N.E.3d at 7-8. The court also stated that a 150-year sentence was effectively the same as a sentence of life without parole and that it "'forswears altogether the rehabilitative ideal.'" *Id.* at 8 (quoting *Graham*, 560 U.S. at 74, 130 S. Ct. at 2030). Such a long sentence also "'means denial of hope; it means that good behavior and character improvement are immaterial; it means that whatever the future might hold in store for the mind and spirit of the [juvenile] convict, he will remain in prison for the rest of his days.'" *Graham*, 560 U.S. at 70, 130 S. Ct. at 2027 (quoting *Naovarath v. State*, 779 P.2d 944, 944 (Nev. 1989)).

[20]     Despite the opinions in *Fuller* and *Brown*, we are not convinced our supreme court intended to discard its holdings from earlier cases that a defendant's youth is not automatically a significant mitigating factor. *See Gross*, 769 N.E.2d at 1141 n.4 (Ind. 2002). "[C]hronological age for people in their teens and early twenties is not the sole measure of culpability." *Id.* (citing *Ellis v. State*, 736 N.E.2d 731, 736 (Ind. 2000)). "There are both relatively old offenders who seem clueless and relatively young ones who appear hardened and purposeful." *Ellis*, 736 N.E.2d at 736.

In reviewing the record in this case and the presentence report, we conclude Hamler is more "hardened and purposeful" than "clueless." There is no indication in the trial record that Hamler was influenced or coerced by other, older persons into committing these crimes. Hamler appears to have fully been an eager, willing participant. Although it is not known who fired the shots at Finney and Keys, Hamler was aggressively threatening both of them during the encounter, pointing an assault rifle at them and demanding that they be tied up. The only person whom Finney described as having any hesitation about what was happening was McDuffy.

Additionally, Hamler has had nearly continuous contact with the criminal justice system since the age of fourteen, when he was first arrested for trespass. He was arrested another eight times as a juvenile, resulting in true findings for Class A misdemeanor battery, Class D felony trespass, two counts of Class A misdemeanor trespass, Class D felony theft, and Class A misdemeanor fleeing law enforcement. As an adult, Hamler has a conviction for Class D felony criminal gang activity, had his probation revoked for that offense, and received another conviction for Class C misdemeanor operating a vehicle without a license. He had other arrests that did not result in convictions. Among these arrests was one for Class C felony criminal recklessness, Class D felony criminal gang activity, Class A misdemeanor carrying a handgun without a license, and Class A misdemeanor dangerous possession of a firearm; this case was dismissed because of an essential witness's refusal or reluctance to testify. Hamler also received several misconduct reports while awaiting trial in jail. In

short, especially given Hamler's criminal gang activity conviction,[3] it is apparent that he already was a "hardened" and experienced criminal at the time he committed these offenses. Additionally, Hamler was just two weeks shy of his twentieth birthday when he committed these crimes. He was not legally a juvenile, unlike the defendants in *Fuller* and *Brown*. Under the circumstances of this case, we do not believe Hamler's relatively young age warrants any special consideration when examining his character and the sentence he received.

[23] We also believe the nature of the offenses here is more egregious than the offenses in *Fuller* and *Brown*. Hamler fully participated in the terrorizing of Finney and Keys for approximately three hours, which included binding both men with duct tape and zip ties and shooting them. Hamler personally, as well as the others, repeatedly badgered Finney and Keys for information about Bango's death. When such information was not forthcoming, Hamler and the others decided they needed to kill Finney and Keys as some kind of tribute to Bango despite any indication that either Finney or Keys were responsible for or knew anything about Bango's death.

[24] In sum, despite some similarities between this case and the facts in *Fuller* and *Brown*, as well as the sentences received by Hamler and the defendants in those cases, we cannot say that Hamler's 140-year sentence is inappropriate. Hamler was several years older than those defendants and the record indicates his

---

[3] In fact, the presentence report states that Hamler helped form a criminal gang when he was fifteen years old.

hardened nature. And, the nature of the offenses here was also more egregious. We fail to perceive sufficient justification for reducing Hamler's sentence.

## Conclusion

[25] Hamler's conviction for Class B felony robbery does not create a double jeopardy conflict with his convictions for murder and attempted murder. Also, his 140-year sentence is not inappropriate. We affirm.

Affirmed.

Riley, J., and Bailey, J., concur.