**Lloyd LICHTI, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

**No. 79A05–0405–CR–264.**

Court of Appeals of Indiana.

May 11, 2005.

Transfer Granted July 19, 2005.

Earl E. McCoy III, Lafayette, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Ellen H. Meilaender, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BAKER, Judge.

Appellant-defendant Lloyd Lichti appeals from his convictions for Felony Murder,[1] Kidnapping,[2] a class A felony, Criminal Confinement,[3] a class B felony, Robbery,[4] a class C felony, and Theft,[5] a class D felony. Lichti also appeals from the sentence assessed by the trial court for his felony murder and robbery convictions. Specifically, Lichti argues that: (1) the trial court erred in dismissing two jurors after deliberations had begun based on the jurors' religious objection to working on Sunday; (2) the evidence was insufficient to support his convictions; (3)

---

1. Ind.Code § 35–42–1–1(2).

2. I.C. § 35–42–3–2.

3. I.C. § 35–42–3–3.

4. I.C. § 35–42–5–1.

5. Ind.Code § 35–43–4–2

the trial court erred in admitting Lichti's custodial statement; (4) the trial court erred in refusing to admit an exhibit offered by Lichti; and (5) the trial court used improper aggravating factors and failed to consider appropriate mitigating factors.[6] Finding that the trial court properly dismissed the two jurors and finding no other error, we affirm.

## FACTS

John Barce, who was seventy-three years old in the summer of 2001, was a former prosecutor who had a private law practice consisting exclusively of estate work. John and his wife, Pat, had been married since 1957 and had three children together, including Jud, who was a partner in John's law firm. John had suffered heart attacks in 1994 and 1995 and was taking heart medication, but he was in excellent physical condition in the summer of 2001.

Approximately ten years prior to 2001, John had prepared a will for Lichti's father, and Lichti believed that the will had been changed to cut him and his brothers out of their share of a family farm. Lichti was angry with John about the will and, after his father's death, believed that he was owed money from his father's estate. In 1995, John sent Lichti a letter informing him that he had no claim on his father's estate and that his stepmother did not owe him any money.

Between the fall of 2000 and summer of 2001, Lichti called John's law firm a number of times, identifying himself as "Martin Price," and seeking to meet with John to discuss a business deal. Although John was prepared to meet with "Price" on several occasions, Lichti did not appear at the meetings. On July 30, 2001, Lichti, as "Price," called the law firm and arranged to meet John at the Radisson Hotel on August 1, 2001.

### The Kidnapping

On August 1, 2001, John went to work and left shortly after 8:00 a.m. to go to the Radisson for his meeting with "Price." He was wearing a light green suit, a dress shirt, a tie, dark shoes, a gold Hamilton wrist watch with a white face and a dark leather strap, and his gold wedding ring. Among the items he had with him were his glasses, a key ring with a remote keyless entry and three keys, a day planner, a pen, a money clip, a small knife, a light blue comb, and a wallet containing numerous items. Surveillance video reveals that John entered the Radisson lobby at approximately 8:43 a.m. Lichti met him there and they exited the hotel together just after 9:00 a.m. John was never seen alive again. John's car was later found in the hotel parking lot, and there have been no unexplained charges on his credit cards or assets missing from his bank accounts since that time.

John entered Lichti's van, though the record does not reveal whether he did so voluntarily. Lichti made a tape recording of John saying, "[w]e have a serious problem. Get 100,000 dollars in hundred dollar bills, Payless." Tr. p. 435, 441. Lichti then bound John's arms and legs with duct tape and left him in the van while Lichti went into the Purdue University Student Union to make the ransom call. At 1:11 p.m., the phone rang at the Barce home, and after Pat answered it, Lichti played the tape recording, subsequently telling Pat to bring $100,000 in one hundred dollar bills to the Payless store in West Lafayette on the following night. Phone rec-

<hr />

**6.** Lichti also argues that if this court reverses the trial court and orders a retrial, he should be released from custody pending the new trial. As we are affirming the trial court's judgment and sentencing in full, we need not reach this issue.

ords show that this call was made from a phone in the Purdue Union building using a pre-paid Kroger telephone card. After receiving the call, Pat contacted her son, Ed, who contacted the police.

After Lichti made the ransom call to Pat, he was driving around in his van with John still inside when he looked at John and noticed that he was not breathing. According to Lichti, John "just died." Tr. p. 975–76, 985–86, 1406. Lichti then drove down Soldiers' Home Road in West Lafayette and dumped John's body in a cornfield in the Soldiers' Home area. The following night, police attempted to make the ransom drop at the Payless per Lichti's instructions, but no one arrived to pick up the money.

On August 23, 2001, Lichti sent a letter to John's law firm containing John's Elk's club card and a ransom letter addressed to Pat. The letter warned Pat, "this time don't notify any law enforcement or we won't meet just like last time," and further stated that John was "well" and that this was their one chance to "get[ ] him back alive." State's Ex. 17. The letter demanded $200,000 in one hundred dollar bills and set up the ransom drop for August 25 at a Taco Bell. Police again attempted to make the ransom drop, and again no one arrived to claim the money.

### John's Body is Discovered

On September 16, 2001, a human skull was discovered in the Soldiers' Home area by a man moving a fence in the vicinity. After the police were contacted, they found the top portion of the almost fully decomposed skull, part of a foot, a dark shoe, and some other smaller bones in a grassy area. Approximately seven to eight rows into the cornfield, police found the remains of the rest of the body. The remains, clothed in a light green suit and tie, were in an advanced stage of decomposition, with almost no tissue remaining. The forensic anthropologist determined that the remains were those of a white male of at least sixty years of age and approximately six feet, two inches tall, which was John's height, and the forensic entomologist determined that the remains had arrived in the field sometime between July 25 and August 7, 2001. No elderly white male other than John had been reported missing around this time.

The police determined that the body was John's—and notified his family of that fact—based on the following evidence: the location of the body, the clothing, the contents of a wallet found inside the clothing, a watch found near the body, and a gold wedding band found on a finger. Forensic dental analysis confirmed that the body found in the field was John's.

### Telephone Calls Continue

On November 1, 2001, Lichti called Pat, claiming that he had information about who killed John. Lichti also informed Pat that he needed money. Lichti made a second call to Pat on the same day, asking for money in exchange for information about the perpetrators. The second call was made from a pay phone at a Thrifty Mart near Horticulture Park ("Park") on the Purdue campus.

On November 2, 2001, Lichti, using the name "Chicago," called Pat two more times, offering information in exchange for money. The first of those calls came from a building on the Purdue campus and the second call came from the West Lafayette Public Library. Indiana State Police Detective Hunter Reese, posing as the Barces' son, Chris, spoke to Lichti when he called the second time and arranged to make the exchange the following day. Lichti told him to go to the pay phone at the Thrifty Mart and await instructions.

On the morning of November 3, 2001, Lichti called Pat again, instructing her to

tell "Chris" to look behind the Coke machine outside the Thrifty Mart. Detective Reese found a note taped there with a map of the Park and directions to look under a particular bench for further instructions. Under that bench, Reese found a bag containing John's checkbook and prosecutor's badge, as well as a few other items belonging to John, and another note instructing him to return to the Thrifty Mart and look behind the 7–UP machine. Reese found a third note taped behind that machine instructing him to go to a different stone bench in the Park. Other detectives performing surveillance in and around the Park during this time saw Lichti walking out of the Park carrying binoculars, standing by a van looking into the Park with binoculars, and driving away from the Park in a van that was registered to Janet Lichti, Lichti's wife. Reese left several thousand dollars for "Chicago" under the bench as instructed, but when no one came to pick it up he retrieved the money, instead leaving a note for "Chicago" explaining what he had done.

### Lichti is Apprehended

On December 22, 2001, "Chicago" called Pat again and accused them of having police at the Park because he had been there and "watched." Tr. p. 462–64, 707. On January 2, 2002, Lichti called Pat again and spoke to Reese, who was again posing as Chris. As they were talking, police traced the call to a pay phone in the Creative Arts Building on the Purdue campus. When officers arrived at the phone, they observed Lichti talking on it. Just after Lichti hung up, the officers received radio notification that the call to the Barces' house had ended. The officers approached Lichti, identified themselves and the reason why they were there, and asked Lichti if he would come with them to answer some questions. Lichti claimed that he was talking to his wife, but agreed to come speak to the officers.

After being read his *Miranda* rights, Lichti spoke to the detectives at the State Police Post. After initially denying any involvement, Lichti then told police that he had been bird-watching in the area where John's body was found when he was accosted by several men at gunpoint who obtained his name and address. Lichti further claimed that a couple of weeks later, he started receiving notes in his mailbox instructing him to call the Barces and demand money, and threatening him if he did not do so. Lichti admitted that he had made several calls to the Barces and that he had been present in the Park for the November exchange. He initially denied having any previous contact with the Barces, but eventually admitted that John had prepared his father's will, and, after being confronted with the 1995 letter from John, admitted more details about that situation. Lichti initially denied being at the Radisson on August 1, 2001, but after being confronted with the surveillance tape, admitted that he had been there to meet someone other than John.

Lichti then changed his story again, admitting that John got into his van and that he then drove John behind the Radisson, where he turned John over to the group of men who had previously accosted him. In this version of events, Lichti admitted that he was "Martin Price" and had made the call to John's law firm setting up the meeting at the Radisson, now claiming that the men who later accosted him had been calling his home prior to August 1 and threatening to have him arrested if he did not arrange this meeting. Lichti further admitted that he made the August 1 ransom call to Pat and that he sent the ransom note to the law firm later in the month.

During a break in the interview, officers observed Lichti appearing to take something out of his wallet and attempt to hide

it in his pants. That object was the pre-paid calling card that had been used to make the first ransom call and the earlier calls to John's law firm.

Finally, Lichti broke down crying and admitted that he had acted alone; he had taken John from the Radisson, bound him in duct tape, and made the ransom demand because he was upset about the outcome of his father's estate and believed that he was entitled to money he had not received. He told police that while he was driving around with John in the van, John "just died," so Lichti dumped his body in the cornfield where it was later found. During the interview, Lichti revealed knowledge of several details about the crime that had never been released to the media or revealed to him by police, including the following facts: (1) a calling card was used for five calls; (2) the ransom demands had required the money to be paid in one hundred dollar bills; (3) a ransom letter was sent to the law firm on August 23 and the details regarding that demand; (4) the exact location and position in which John's body was found; (5) there was duct tape found on John's hands and legs; and (6) details regarding the calls made to the Barces between November 1, 2001, and January 2, 2002. At the end of the interview, Lichti recanted his confession that he had acted alone and returned to his earlier story of having acted pursuant to the threats of the other unknown men.

When the police searched Lichti's house, police found, among other things, a type-writer, which Lichti told them he had used to type the ransom letter, a tape recorder, and a spiral notebook. A forensic document examiner determined that the four letters left at the Thrifty Mart and the Park on November 3, 2001, had either come from that notebook or had been written on top of that notebook. Additionally, torn remnants of the spiral bound pages found inside the notebook's coil were matched to the edges of those four letters. Furthermore, the envelopes in which those letters were found contained the same characteristics as envelopes that were found in Lichti's desk.

On January 7, 2002, the State charged Lichti with felony murder, robbery, theft, two counts of kidnapping, and two counts of criminal confinement. While Lichti was incarcerated, he instructed his son, Steven, where to find certain items in Lichti's house and to destroy those items. Among other things, Lichti told Steven to destroy some letters he would find on top of a lazy susan. In December 2003, Steven and his mother turned the letters over to the prosecutor's office. One of the documents was the note that Detective Reese had left for "Chicago" under the stone bench in the Park explaining what he had done with the money, and another document contained a handwritten list of the names, addresses, and phone numbers for John and Pat Barce, all three of their sons, and John's law firm, as well as the phone numbers for the pay phones at Payless, Thrifty Mart, and another location from which Lichti had called Pat.

Following a jury trial conducted on March 1 through March 7, 2004, the jury found Lichti guilty as charged on all counts. On April 5, 2004, the trial court sentenced Lichti to sixty-five years of incarceration on the felony murder conviction and eight years of incarceration on the class C felony robbery conviction, with the sentences to be served consecutively. Because of double jeopardy concerns, the trial court did not enter judgment or sentence on the remaining verdicts. Lichti now appeals.

## DISCUSSION AND DECISION

### I. Juror Dismissals

Lichti first argues that the trial court improperly dismissed two jurors dur-

ing deliberations and replaced them with alternates when the jurors stated—after deliberations had begun—that their religious beliefs would not allow them to participate in the deliberations on Sunday. Specifically, Lichti contends that this act deprived him of his constitutional right to a fair trial by an impartial jury.

▮ As we consider this argument, we note that trial courts traditionally have significant discretion in determining whether to replace a juror with an alternate, and we have reversed that decision only for an abuse of that discretion. *Spears v. State,* 811 N.E.2d 485, 488 (Ind. Ct.App.2004). But removal of a juror after deliberations have begun raises concerns that are distinct from those raised by the pre-deliberations removal of a juror. *Riggs v. State,* 809 N.E.2d 322, 327 (Ind.2004). Thus, although the matter is still within the trial court's discretion, that discretion is more limited. *Id.* at 327–28. According to our supreme court, "[o]nce deliberations begin, discharge of a juror is warranted only in the most extreme situations where it can be shown that the removal of the juror is necessary for the integrity of the process, does not prejudice the deliberations of the rest of the panel, and does not impair the parties [sic] right to a trial by jury." *Id.* Indiana Trial Rule 47(B) provides that alternate jurors "shall replace regular jurors who, prior to the time the jury returns its verdict, become or are found to be unable or disqualified to perform their duties."

In this case, the jury was sequestered from the beginning of trial on Monday, March 1, 2004. The case was submitted to the jury for deliberations to begin at 2:15 p.m. on Saturday, March 6, 2004. At 10:40 p.m. on March 6, the jury sent a note indicating that it wanted to stop work for the night, that it did not want to deliberate on Sunday, and seeking instructions as to worship and family visitation on Sunday. The parties did not consent to allow the jurors to separate, and the trial court informed all of the jurors that they could not have family visitation or attend worship services on Sunday. In the presence of the entire jury, the trial court queried as to the number of jurors whose religious scruples constrained them from working on Sunday, and three jurors indicated that they had such beliefs. When the court asked whether this was a mandatory requirement of their faith, only one of the three replied that it was.

The trial court then excused the juror for whom this was mandatory, replacing him with an alternate, and sent the jurors back to the jury room to decide what time they wanted to resume deliberations on the following day. After defense counsel objected to the removal of the juror, the trial court remarked that it was "concerned about the inconvenience to all the jurors, the possibility of tainting the deliberations, and the significant expense of keeping the jurors around for the day with feeding them, housing them, [and] without making progress on the deliberations...." Tr. p. 1705. Subsequently, a second juror indicated that after struggling with the issue, she had determined that if she could not attend worship services, then it was mandatory for her as well not to deliberate on Sunday. In the presence of the entire jury, that juror was also excused based on those reasons. The jury resumed deliberations at 10:00 a.m. on Sunday, March 7, 2004, and returned with its verdict at 3:00 p.m. on the same day.

Lichti first argues that the integrity of the process would have been best served by permitting the jurors to recess but remain sequestered until Monday, at which time they could have resumed deliberations. Our review of the record and the sequence of events has revealed that this

was an extremely high profile case that received a significant amount of media attention. As the trial court noted, the longer the trial continued, the greater the risk that something might happen to taint the jury. Moreover, it would impose a significant burden on jurors who had already been sequestered for a week to require them to endure another day of sequestration in which no progress is being made in the deliberative process. Accordingly, the trial court was within its discretion to conclude that the integrity of the process was best served by excusing these two jurors mid-deliberations.

Lichti next contends that even if the dismissal of the jurors was warranted, the trial court failed to ensure that their dismissal would not prejudice the deliberations of the rest of the panel. Specifically, Lichti argues that the trial court should have questioned the remaining jurors about the effect of the removal of two jurors on the deliberations, pointing to *Threats v. State*, 582 N.E.2d 396 (Ind.Ct. App.1991), *trans. denied*, as support for his contention.

In *Threats*, a group of jurors notified the trial court that the juror at issue had revealed during deliberations that he knew the defendant's wife, a fact he had not brought to the court's attention. 582 N.E.2d at 398–401. In that situation, there was a reasonable risk that the juror's conduct had prejudiced other members of the jury and, as a result, it was incumbent upon the trial court to question the remaining jurors to ensure they could remain impartial. *Id.*

Here, unlike *Threats*, there is no suggestion that the conduct of the excused jurors was in any way improper or created a risk to improperly influence the rest of the jury. Moreover, the trial court's discussion with the jurors and the explanation for their dismissal occurred in the presence of the entire jury panel. Accordingly, it is highly unlikely that the remaining jurors may have misconstrued the reason why the two jurors were dismissed. Similarly, there was no possibility that the trial court's action could have been misconstrued as an implied agreement or disagreement with those jurors' substantive views of the case, as those views were unknown to the judge and formed no basis for their dismissal. All of these factors, in combination, lead us to conclude that it was not incumbent upon the trial court in this case to question the remaining jurors as to the effect the two jurors' dismissal would have on the deliberations. The trial court, therefore, was acting within its discretion when it dismissed the two jurors because their faith prevented them from deliberating on Sunday.

*II. Sufficiency of the Evidence*

█ Lichti next argues that the evidence was insufficient to support his convictions. Specifically, he argues that because the prosecution failed to establish John's cause of death, his felony murder conviction must be reversed. He further contends that if the murder conviction is reversed, there is insufficient evidence to support his remaining convictions for kidnapping, criminal confinement, robbery, or theft.

█ In reviewing a challenge to the sufficiency of the evidence, an appellate court does not reweigh the evidence or assess witness credibility. *Dillard v. State*, 755 N.E.2d 1085, 1089 (Ind.2001). Rather, we consider only the evidence most favorable to the verdict and all reasonable inferences therefrom. *Id.* We will affirm a verdict unless no rational factfinder could have found the defendant guilty beyond a reasonable doubt. *Clark v. State*, 728 N.E.2d 880, 887 (Ind.Ct.App. 2000), *trans. denied.*

■ Lichti's argument that he should not have been convicted of felony murder because John's cause of death was not established by the prosecution is inapposite inasmuch as the State is not required to prove a precise cause of death to sustain such a conviction. To the contrary, if the designated felony—here, kidnapping—was the " 'mediate or immediate' " cause of the death, then the State has sustained its burden. *Jenkins v. State,* 726 N.E.2d 268, 269 (Ind.2000) (quoting *Reaves v. State,* 586 N.E.2d 847, 854–55 (Ind.1992)). Our supreme court has articulated the felony murder causation rule as follows:

"Where the accused reasonably should have ... foreseen that the commission of or attempt to commit the contemplated felony would likely create a situation which would expose another to the danger of death ..., and where death in fact occurs as was foreseeable, the creation of such a dangerous situation is an intermediary, secondary, or medium in effecting or bringing about the death of the victim."

*Palmer v. State,* 704 N.E.2d 124, 126 (Ind. 1999) (quoting *Sheckles v. State,* 684 N.E.2d 201, 205 (Ind.Ct.App.1997), *trans. denied*).

Here, the evidence is overwhelming that Lichti's conduct contributed to John's death in a reasonably foreseeable manner. By Lichti's *own admission,* he kidnapped John, an elderly man with heart problems, bound his arms and legs with duct tape, forced him to record a ransom message to his wife of over forty years, and that at some point while John was Lichti's captive, he "just died." Tr. p. 975–76. Because Lichti dumped John's body in a cornfield and left it there to decompose for six weeks, it was impossible to determine a precise cause of death. But the evidence shows that Lichti's act of kidnapping John set in motion the series of events resulting

in John's death and that such a result was reasonably foreseeable. The State does not need to show a precise cause of death to sustain a conviction for felony murder, and here it has proffered more than sufficient evidence to sustain Lichti's felony murder conviction. The jury was well within its province to convict Lichti on this count.

As to the other charged crimes, the evidence of Lichti's guilt is similarly overwhelming: Lichti arranged the meeting with John, kidnapped him, bound him in duct tape, made the ransom call, dumped John's body in the cornfield, made the second ransom demand, and made all subsequent contacts with the Barce family. His confession is corroborated by substantial independent evidence as detailed in the *FACTS* above, including Lichti's motive, the Radisson surveillance video, Lichti's presence in the Park for the attempted ransom drop on November 3, the forensic evidence found in Lichti's home, and the fact that police officers caught him red-handed making the final phone call to the Barces on January 2. This evidence, along with the other evidence detailed above, is more than sufficient to sustain Lichti's remaining convictions, and the jury was well within its province to convict Lichti for kidnapping, criminal confinement, robbery, and theft.

### III. Admission of Lichti's Confession

■ Lichti next argues that the trial court erred in admitting the statement he gave to police in which he confessed to committing the acts described herein. Specifically, he avers that the officers failed to read him his *Miranda* rights and that he was denied his right to have counsel present during questioning.

■■ The decision to admit a defendant's statement is left to the trial court's sound discretion. *Turner v. State,* 738 N.E.2d 660, 662 (Ind.2000). The decision

to admit a confession will not be reversed absent an abuse of that discretion. *Ringo v. State*, 736 N.E.2d 1209, 1211 (Ind.2000). In reviewing that decision, we will not reweigh the evidence, and conflicting evidence is viewed most favorably to the trial court's ruling. *Turner*, 738 N.E.2d at 662.

The State bears the burden of proving beyond a reasonable doubt that the defendant's confession was given voluntarily and that he voluntarily and intelligently waived his *Miranda* rights. *Ringo*, 736 N.E.2d at 1211. To determine whether the confession was given voluntarily, courts examine the totality of the circumstances, ensuring that the confession was not induced by violence, threats, or other improper influences that overcame the defendant's free will. *Id.* at 1212. Among the factors considered are police coercion, the length, location, and continuity of the interrogation, and the defendant's maturity, education, and physical and mental condition. *Allen v. State*, 787 N.E.2d 473, 480 (Ind.Ct.App.2003), *trans. denied.* This same test determines whether *Miranda* rights were voluntarily waived. *Ringo*, 736 N.E.2d at 1212. A signed waiver form is one way of showing the defendant was aware of and understood his rights, but "an express written or oral waiver of rights is not necessary to establish a waiver of *Miranda* rights." *Carter v. State*, 730 N.E.2d 155, 157 (Ind.2000).

The evidence shows that after the police officers caught Lichti in the act of calling the Barces, Lichti agreed to come to the State Police Post to speak to the investigators. Lichti was informed that he did not have to talk to them and that he had the right to consult with an attorney. At the beginning of the interview, Detective Reese advised Lichti orally of his full *Miranda* rights, and Lichti stated that he understood those rights. Lichti proceeded to give a statement to Reese. At no time,

either during the drive to the station or during the interview itself, did Lichti ever request to speak to an attorney. The entire interview lasted approximately four hours, and Lichti was given several breaks during that time, was allowed to go outside and take a walk, was offered lunch, and was given coffee. Lichti is a college-educated adult who was employed as a mortgage broker.

Lichti denies that he was advised of his *Miranda* rights, claims that he requested an attorney three times, and makes much of the fact that he did not sign a form waiving his *Miranda* rights. As to the final claim, as noted above, an express written waiver of *Miranda* rights is not necessary to establish a valid waiver. *Carter*, 730 N.E.2d at 157. As to the first two claims, several police officers testified that in fact, Lichti was advised of his *Miranda* rights and never requested an attorney. We will not reweigh this evidence and conclude that the record establishes that the trial court did not abuse its discretion in admitting Lichti's statement.

Lichti also seems to argue that the State destroyed evidence and that, as a result, his convictions should be reversed. The record shows that prior to the start of Lichti's interview, Detective Reese put a videotape in the camera, started it, and the machine appeared to be recording; however, when he attempted to review the tape a day or two later, he discovered that something had gone wrong and that, in fact, the interview had not been recorded at all. Lichti takes a giant leap from this evidence and concludes that the State must have destroyed the videotapes, but there is simply nothing in the record to substantiate that allegation. Accordingly, the trial court properly found Lichti's statement to be admissible.

## IV. Exclusion of Hearsay Evidence

█ Lichti next argues that the trial court erred in refusing to admit into evidence: (1) a typed, unsigned letter with no return address and with an Ohio postmark that was sent to Lichti's attorney at his law office while Lichti was incarcerated; and (2) an affidavit from Lichti's attorney's secretary to establish a chain of custody for the letter.

█ As we consider this argument, we note that the decision to admit or exclude evidence falls within the trial court's sound discretion and is afforded great deference on appeal. *Fugett v. State*, 812 N.E.2d 846, 848 (Ind.Ct.App.2004). We will not reverse a trial court's exclusion of evidence except when the exclusion constitutes a manifest abuse of discretion resulting in the denial of a fair trial. *Id.* An abuse of discretion occurs where the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court. *Id.*

Hearsay—a statement other than one made by the declarant while testifying at trial, offered to prove the truth of the matter asserted—is inadmissible. Ind. Evidence Rules 801, 802. The business records exception to the hearsay rule applies to documents that are compiled or prepared in the regular course of business. Evid. R. 803(6). Furthermore, only relevant evidence—that having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence—is admissible. Evid. R. 401, 402.

Here, the author of the letter purports to have been threatened by police officers after cashing a check at "Hocking Valley Bank in The Plains" from a "Charles Siegel," who in turn had "deposited 2 checks from John Barce." Appellant's App. p. 2068–69, 2072. The State objected to its admission on the grounds that it was irrelevant and was hearsay. Lichti responded that it was admissible under the business records exception to the hearsay rule and that it was not offered for the truth of the matter asserted, but instead to show physical similarities between this letter and some of the other letters that were recovered inside Lichti's house. The trial court sustained the State's objections, finding that the letter was irrelevant as to whether Lichti committed the crime and, to the extent it might be relevant to show someone else's participation in the crime, the letter was hearsay.

If offered for the truth of the matter asserted, an unsigned, anonymous letter constitutes hearsay. *See Badelle v. State*, 754 N.E.2d 510, 523–24 (Ind.Ct.App.2001), *trans. denied* (holding that unsigned affidavit was inadmissible hearsay evidence). Moreover, it does not fall within the business records exception because there is no evidence that the letter was prepared by someone in the course of his or her regularly conducted business activity. If it was not offered for the truth of the matter asserted, the letter bears no relevance to this case. We agree with the State that "[i]f the substance of the letter is ignored, the most that could be said about the letter, considering all speculations and inferences in the light most favorable to Defendant, would be that someone else also has a typewriter, such as an IBM Selectric, that uses a font similar to the one used in a letter found in Defendant's house. That does not make Defendant's guilt any more or less probable." Appellee's Br. p. 30. The trial court properly excluded this letter as irrelevant hearsay evidence.[7]

7. Moreover, even if we consider for argument's sake that the trial court erred in ex-

### V. Lichti's Sentence

Lichti next contends that the trial court erred in imposing his sentence. Specifically, Lichti argues that the trial court used improper aggravating factors and did not properly consider all mitigating factors.[8]

As we consider these arguments, we note that sentencing decisions are generally left to the trial court's sound discretion and are reviewed only for an abuse of discretion. *Anderson v. State*, 798 N.E.2d 875, 879 (Ind.Ct.App.2003). It is within the trial court's discretion to impose an enhanced sentence. *Id.* A single aggravating factor is sufficient to support an enhanced decision. *Id.* In reviewing a sentencing decision, we may consider both the written sentencing order and the trial court's oral sentencing statement at the sentencing hearing. *Corbett v. State*, 764 N.E.2d 622, 631 (Ind.2002). The sentencing statement must identify significant aggravating and mitigating circumstances, state the specific reason why each circumstance is aggravating or mitigating, and demonstrate that the aggravating and mitigating circumstances have been weighed to determine that the aggravators outweigh the mitigators. *Cox v. State*, 780 N.E.2d 1150, 1155–56 (Ind.Ct.App.2002).

### A. Aggravating Factors

The trial court found several aggravating factors. First, it noted the "strong" risk that Lichti would commit another crime, citing as support for that aggravator the following facts: (1) Lichti had the names, addresses, and telephone numbers of everyone in the Barce family in his wallet; (2) Lichti continued to torment the Barces long after Barce was dead and continued to do so throughout the trial; (3) Lichti had John's name and address—an attorney who had stopped representing Lichti's father ten years ago—on his person; (4) Lichti has an unquenchable thirst for revenge; and (5) Lichti's "anger," "hatred," "sense of entitlement," and sense that he's innocent "are unlikely to leave [him] no matter how much blood [he] shed[s]...." Tr. p. 1752–53.

The second aggravating factor found by the trial court was the nature and circumstances of the crime:

[t]his was a premeditated crime, effectuated with an elaborate plan that you waited patiently to effect over the course of several months. You—after the death of John Barce you continued to attempt to extort money from the family first on the false hope that he was still alive and then on the false hope that you might have information about his killers which you still shamelessly dangle in front of the family today.... I have to believe that you intended to kill him. And that you intended to kill him after you had achieved whatever your objectives were which I believe included both revenge and extortion.... You've shown no remorse ... and you've shown quite

---

cluding this letter, it was harmless error in light of the overwhelming evidence of Lichti's guilt.

8. Lichti comments that the sentence is "inappropriate," Appellant's Br. p. 30–31, but his entire argument on this issue is the following sentence: "[i]n the alternative, this Court should revise Lichti's sentence as it is inappropriate under Appellate Rule 7(B)." Appellant's Br. p. 35. Lichti offers no cogent argument and cites to no authority to support his contention, and he has, therefore, waived the issue for our consideration. Ind. Appellate Rule 46(A)(8)(a). Moreover, Lichti has not raised any argument that his sentence is improper in light of *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), and *Smylie v. State*, 823 N.E.2d 679 (Ind.2005), and has also, therefore, waived this issue for our consideration.

the opposite by tormenting the family over that period of time.

*Id.* p. 1753–54. Additionally, the trial court noted the following circumstances: (1) "the horror of allowing the body to decompose ... to be torn apart by animals, to lie in a—in the field while you were saying that he was alive and continuing to ask for ransom"; and (2) that Lichti asked his son to go to his home and destroy certain evidence. *Id.* p. 1755. The third aggravator considered by the trial court was the fact that John was over 65 years of age. *Id.* p. 1754. The final aggravating circumstance was the Barce family's desire that Lichti be given an enhanced sentence. *Id.* p. 1757.

■■■ The risk that defendant will reoffend, the nature and circumstances of the crime, and the victim's age, are all proper aggravating factors. Ind.Code §§ 35–38–1–7.1(a)(1), -(a)(2), (a)(4), (b)(5). Moreover, while victims' recommendations regarding sentencing are not proper aggravating factors, they may assist a trial court in determining what sentence to impose. *Brown v. State,* 698 N.E.2d 779, 782 (Ind.1998). As noted above, a single aggravating factor is sufficient to support an enhanced sentence. *Anderson,* 798 N.E.2d at 879. Thus, even if the trial court erred in considering the Barce family's request for an enhanced sentence, it was harmless in light of the devastating litany of proper aggravators set forth above. Accordingly, we find no error in the trial court's consideration of aggravating factors.

### B. Mitigating Factors

■■■ The finding of mitigating circumstances also lies within the trial court's discretion. *Spears v. State,* 735 N.E.2d 1161, 1167 (Ind.2000). The trial court is not obligated to find a circumstance to be mitigating merely because the defendant advances such an argument. *Id.* The trial court need not consider, and we will not remand for reconsideration of, alleged mitigating factors that are highly disputable in nature, weight, or significance. *Newsome v. State,* 797 N.E.2d 293, 301 (Ind.Ct. App.2003). Moreover, the trial court is not obligated to give mitigating factors the same weight or value that they are given by the defendant. *Id.* Indeed, a trial court is under no obligation to find any mitigating factors at all. *Id.*

As to mitigating factors, the trial court commented that in light of the circumstances of this crime,

> the fact that you have no prior convictions is hardly a mitigator. The fact that you were at one point a Boy Scout leader is hardly a mitigator.

Tr. p. 1755. Lichti first argues that this statement demonstrates that the trial court failed to give his lack of criminal history substantial mitigating weight. Our supreme court has determined that a trial court may consider a defendant's lack of criminal history but need not accord it significant weight. *Thacker v. State,* 709 N.E.2d 3, 10 (Ind.1999). The trial court's sentencing statement demonstrates that while it considered Lichti's lack of a criminal history, it found, as it was entitled to do, that in light of the overwhelming aggravators, this fact does not have substantial mitigating weight.

■■■ Lichti next points to the trial court's denial of his request for a continuation of the sentencing hearing so that he could obtain a "complete psychological evaluation." Appellant's Br. p. 32. He contends that had he been able to obtain this evaluation, it would have revealed that he is mentally ill, which would have been considered by the trial court as a mitigating factor.

Our review of the record shows no evidence that suggests that Lichti suffers from any mental illness or psychological disorder. At his probable cause hearing, Lichti told the court that he had never been treated for any mental illness, nor, to his knowledge, did he suffer from any. In the pre-sentence investigation report, Lichti stated that he did not have a history of mental health problems, and he did not dispute the accuracy of that information at the sentencing hearing. Lichti had over two years while this case was pending prior to sentencing to obtain a psychological examination, and he chose not to do so. As there is no evidence that a psychological examination would have uncovered any relevant information, the trial court was well within its discretion to deny Lichti's motion for continuance.

Finally, Lichti contends that he was denied the opportunity to develop and present all mitigating factors because the probation department did not complete an LSI–R evaluation of Lichti. An LSI–R report is used by the probation department as a tool to enhance pre-sentence reports, and it measures predictors of criminal conduct, including antisocial attitudes, antisocial associates, antisocial personality, a history of antisocial and problematic behavior, and difficulties at home, school, work and leisure. Lichti argues that "[a]ll evidence indicates that [he] would have scored as a low risk to re-offend." Appellant's Br. p. 34.

■ We note initially that Lichti does not have a right to the completion of an LSI–R evaluation to be included in the pre-sentence investigative report. *See generally* Ind.Code § 35–38–1–9. Moreover, Lichti's bald assertion that "all evidence" indicates that he would have scored as a low risk to re-offend is simply not borne out by the record. The trial court amply supported its conclusion that there was a high risk that Lichti would re-offend with evidence from the record, detailed above, so there is no reason to conclude that an LSI–R evaluation would have been positive for Lichti or that the trial court's judgment regarding his likelihood to re-offend would have been changed by the evaluation. We conclude, therefore, that the trial court properly considered and weighed the aggravating and mitigating factors, and that it did not err in imposing Lichti's sentence.

### CONCLUSION

In sum, we conclude that: (1) the trial court properly dismissed two jurors who were unable to continue deliberations on Sunday because of their religious faith; (2) the evidence is more than sufficient to support Lichti's convictions; (3) the trial court properly admitted the statement Lichti gave to police officers; (4) the trial court properly excluded as hearsay the anonymous unsigned letter offered by Lichti; and (5) the trial court properly sentenced Lichti.

The judgment of the trial court is affirmed.

KIRSCH, C.J., and BARNES, J., concur.