**FOR PUBLICATION**

FILED
Sep 12 2014, 6:45 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**DONALD R. SHULER**
Barkes, Kolbus, Rife & Shuler, LLP
Goshen, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**IAN MCLEAN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| ANTHONY P. SHARP, JR., | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 20A04-1310-CR-501 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE ELKHART CIRCUIT COURT
The Honorable Terry C. Shewmaker, Judge
Cause No. 20C01-1210-MR-4

**September 12, 2014**

**OPINION - FOR PUBLICATION**

**DARDEN, Senior Judge**

<u>STATEMENT OF THE CASE</u>

Anthony P. Sharp, Jr., appeals from his conviction of and sentence for felony murder,[1] contending that there was insufficient evidence to support his conviction, that the felony murder statute was improperly applied in this situation, and that his sentence is inappropriate in light of the nature of the offense and the character of the offender. Consistent with our standard of review, we affirm Sharp's conviction. However, we reverse the trial court's sentencing decision and remand with instructions to modify Sharp's sentence.

<u>FACTS AND PROCEDURAL HISTORY</u>

On the morning of October 3, 2012, sixteen-year-old Jose Quiroz was at his residence at 1922 Frances Avenue in Elkhart, Indiana with sixteen-year-old Blake Layman, and seventeen-year-old Levi Sparks. The three decided to commit a burglary and explored potential homes to burglarize in the neighborhood, with a preference for unoccupied homes. It was discussed that burglarizing occupied homes was more dangerous because the presence of the homeowner could result in injuries and more severe legal consequences. Quiroz, Layman, and Sparks then walked from Quiroz's residence to Tracy Lehman's house at 1904 Frances Avenue. Lehman, who was upstairs taking a bath, heard a knock on the front door of her house. Sparks was later identified as the person who had knocked on her door. Lehman heard her dogs bark and the sound of one or more people pacing on her front porch. Lehman then heard a second knock on her door while her dogs continued to bark, and after some time, heard the sound of people leaving her front porch. Sparks

---

[1] Ind. Code § 35-42-1-1 (2007).

told Quiroz that the home was not a suitable target for the burglary because of the presence of the dogs. They next determined that another home was unsuitable as a burglary target because someone was home.

Michael Couch lived at 1920 Roys Avenue, an address which was on the same block and slightly southwest of Rodney Scott's house, which ultimately was burglarized by the group. At approximately 2:20 p.m., Couch saw two people walk through the alley separating his house from Scott's, before they disappeared from Couch's view behind a garage. They reappeared walking in the alley. They left the alley and walked between Scott's house, located at 1919 Frances Avenue, and the house of Scott's next-door neighbor, Julia Leazenby, who lived at 1913 Frances Avenue.

Scott, who had been laid off from his regular employment, had awakened that morning at approximately 6:00 a.m. He watched television in the downstairs portion of his two-story home until 9:00 a.m. when he became sleepy and returned to his bedroom upstairs. Scott used a powered breathing mask to sleep. The construction of Scott's house was such that anyone in the upstairs portion of the house could not always hear someone knocking on the front door. The doorbell at Scott's house was not functioning, but he had installed a wireless doorbell. The wireless doorbell, however, only chimed on the first floor of his residence.

Quiroz, Layman, and Sparks chose Scott's house as the target for the burglary. Subsequently, Quiroz called Sharp, who had just turned eighteen years old on June 6, 2012, and his cousin, Danzele Johnson, to "help . . . get into the house." Tr. p. 934. The group met at Quiroz's residence where they spent some time socializing. They were still at the

3

house when Quiroz's mother, Rebecca McKnight, left to meet a friend for lunch. McKnight recalled that they also spent some time together on the porch of the house. Sharp later told police officers that during this meeting at Quiroz's house, Quiroz and Johnson discussed where the money was and where the police were. There is no evidence that the dangers associated with burglarizing homes was discussed in Sharp's presence. The group then left to burglarize Scott's house. Sparks told police officers that he remained outside Scott's house with a cell phone in the event that the police or a visitor arrived at the scene. Quiroz also had a cell phone with him at that time.

Scott awoke around 2:30 p.m. Scott later recalled, "As soon as I sat up on the side of the bed, there was this boom, and my whole house just shook." *Id.* at 1067. Scott heard a second loud booming noise and felt another vibration. Quiroz, Layman, Johnson, and Sharp had entered Scott's house by kicking open the rear door to Scott's kitchen, a door which Scott kept locked when he was sleeping. The force used was such that it ripped away enough of the door's frame to allow entry through the doorway and into the kitchen. The group then began looking for items to steal from Scott's home. A knife block containing knives was located in the kitchen. Scott's watch and wallet, which were also located near the knife block, were taken by the burglars.

As Scott picked up his cell phone, he remembered that a burglary had occurred in the neighborhood earlier that week.[2] He retrieved a handgun from his bedroom and opened the bedroom door. Scott, who weighed approximately 270 pounds, decided to proceed by

---

[2] A limiting instruction was given to the jury preventing them from considering the testimony for any purpose other than Scott's thought process.

4

loudly running down the wood stairs, to the first floor in case there were burglars inside his home, hoping that they would hear him and flee. He did so and walked through the living room of his house to determine if anyone was on the first floor.

As Scott reached the dining room, looking to one side, he saw someone in his kitchen turn and flee from the house through the kitchen's back door. Looking to the other side, Scott saw two burglars standing at the door to the bedroom adjacent to the dining room. Scott was between them and the kitchen exit door. Scott, who held his handgun at his side, feared that he might be hurt or killed, and did not know if the burglars were armed. He decided to frighten the burglars and cause them to remain in the bedroom before they could attack him and before the burglar who fled might return. Scott began firing his handgun, aiming low toward the floor. A subsequent examination of Scott's residence confirmed that the shots he fired struck several locations just above the level of the floor.

The two burglars in the bedroom fled into the bedroom's closet and closed the door behind them. Scott then called 911 and spoke with a dispatcher who informed him that police officers were en route to his location. The closet door then opened and Scott shouted, "Keep the door closed" and "Don't open up that door." *Id.* at 1080. The door opened a few moments later and Scott observed one of the burglars go to the floor. Quiroz told Scott that the burglar who had fallen to the floor, who was later identified as Johnson, had been shot. Scott, who had remained in contact with the police dispatcher, informed the dispatcher about the injury and requested an ambulance. At this point, Scott recognized Quiroz as a neighbor, later noting, "I watched him grow up. I watched his family move into that house." *Id.* at 1084. Scott had made reference to that fact to Quiroz at the time

5

of the burglary, but Quiroz claimed that he was not from that area.

Scott observed a third male, who he had not seen before, emerge from the closet holding his leg and asking if he could sit on the bed. That male was later identified as Layman. Scott denied Layman's request, telling him to remain where he was. Quiroz poked his head out of the closet, but Scott told him to remain where he was. When the police arrived and entered Scott's house, Scott put his handgun down and told the officers, "They're right there in the bedroom by the closet." *Id*. at 1085.

Scott later recalled that Quiroz "flew out of the closet, pushed over the armoire that was in front of the window, went over the top of the two that was [sic] there on the floor, and just crashed through the window" of the bedroom. *Id.* The officer pursued Quiroz and the dispatcher told Scott to exit his house. Scott followed the dispatcher's instructions, and the instructions given by other officers on the scene. Officers then entered the house and arrested Layman, who was treated for his leg wound. Johnson died at the scene from his gunshot wound.

Carol Black was driving a school bus carrying dozens of children who had been dismissed for the day from Hawthorne Elementary School. While on her route, Black stopped her bus at the intersection of Frances and Blaine Avenues, where she saw a police cruiser drive past her. After the police cruiser had left the area, Black saw a white male with short hair walking north on Roys Avenue across Blaine Avenue. Black observed that the male kept looking back until he had crossed the street, after which he began to run away. The white male was later identified as Sparks, who had abandoned his cell phone at the scene of the burglary. Black continued on her bus route by driving down Blaine

6

Avenue, where she saw a dark-complected male exit from an alley and run past her bus before he proceeded onto Roys Avenue, with two police officers in pursuit.

The second male Black observed was Quiroz, and the officers pursuing him were Elkhart Police Corporal James Ballard and Corporal Andrew Florea, who responded to the dispatch of a burglary with shots fired. The officers had chased Quiroz on foot and in a police cruiser through alleys and yards in the area. They successfully apprehended Quiroz as he ran toward Frances Avenue and observed that his hands and arms were covered in blood. The amount of blood on Quiroz was inconsistent with the small cuts he had on his hands.

Unlike Quiroz and Sparks, Sharp fled on foot to the south of Scott's residence. Peter Campiti, a neighbor who lived to the south of Scott's house, found a knife laying in his backyard on the day of the burglary. The knife had not been in Campiti's yard the day before. Campiti reported his discovery of the knife to the police, who took it into evidence. The knife was the same shape, color, and style of the knives in the knife block in Scott's kitchen. One knife was missing from Scott's knife block.

On October 9, 2012, the State charged Sharp and the others with felony murder. Layman, Sparks, and Sharp were tried together in a jury trial beginning on August 19, 2013, and concluding on August 22, 2013. Each defendant was found guilty of felony murder. Sharp was sentenced to the advisory sentence of fifty-five years executed in the Department of Correction, while Layman received the same sentence, and Sparks received a fifty-year sentence. Quiroz, who pleaded guilty, was sentenced to fifty-five years with ten years suspended to probation. Sharp now appeals.

7

DISCUSSION AND DECISION

I.

Sharp claims that the evidence is insufficient to sustain his conviction for felony murder. Our standard of review of such claims is well settled. "In reviewing a sufficiency of the evidence claim, we do not reweigh the evidence or assess the credibility of the witnesses." *Treadway v. State*, 924 N.E.2d 621, 639 (Ind. 2010). Rather, we look to the evidence and reasonable inferences drawn therefrom that support the verdict. *Id.* We will affirm the conviction if there is probative evidence from which a reasonable jury could have found the defendant guilty beyond a reasonable doubt. *Id.* "It is therefore not necessary that the evidence 'overcome every reasonable hypothesis of innocence.'" *Drane v. State*, 867 N.E.2d 144, 147 (Ind. 2007) (quoting *Moore v. State*, 652 N.E.2d 53, 55 (Ind. 1995)).

This court has previously explained the application of the felony murder statute.

Our legislature has pronounced that "A person who . . . kills another human being while committing or attempting to commit . . . robbery . . . commits murder, a felony." Ind. Code §35-42-1-1(2). In its interpretation of this statute, our supreme court has determined that the State need not prove intent to kill, only the intent to commit the underlying felony. *Vance v. State*, 620 N.E.2d 687, 690 (Ind. 1993). Our supreme court further held in *Palmer v. State*, 704 N.E.2d 124, 126 (Ind. 1999), that the statutory language "kills another human being while committing" does not restrict the felony murder provision only to instances in which the felon is the killer, but may also apply equally when, in committing any of the designated felonies, the felon contributes to the death of any person. Citing, I.C. § 35–42–1–1(2); *see also*, *Jenkins v. State*, 726 N.E.2d 268 (Ind. 2000) (co-perpetrator was shot and killed by robbery victim and the defendant was convicted of felony murder for that death). The *Palmer* court used this interpretation of the felony murder statute to uphold a conviction of Palmer for the murder of his co-perpetrator who had been shot by a law enforcement officer. Our supreme court explained:

8

> Our Court of Appeals has correctly observed: [A] person who commits or attempts to commit one of the offenses designated in the felony-murder statute is criminally responsible for a homicide which results from the act of one who was not a participant in the original criminal activity. Where the accused reasonably should have . . . foreseen that the commission of or attempt to commit the contemplated felony would likely create a situation which would expose another to the danger of death at the hands of a nonparticipant in the felony, and where death in fact occurs as was foreseeable, the creation of such a dangerous situation is an intermediary, secondary, or medium in effecting or bringing about the death of the victim. There, the situation is a mediate contribution to the victim's killing.

[*Palmer*, 704 N.E.2d] at 126 (citing, *Sheckles v. State*, 684 N.E.2d 201, 205 (Ind. Ct. App. 1997)).

*Exum v. State*, 812 N.E.2d 204, 207-08 (Ind. Ct. App. 2004).

Sharp acknowledges that Quiroz identified him as one of the burglars. Yet, he contends that we should reassess the caliber and quality of Quiroz's testimony and reverse Sharp's conviction. While rejecting this argument, we reiterate that "[a] murder conviction may rest solely on the uncorroborated testimony of an accomplice." *Thompson v. State*, 671 N.E.2d 1165, 1167 (Ind. 1996). Here, Quiroz's testimony linking Sharp with the burglary and the death resulting from that burglary is also corroborated by other evidence. While not reweighing the evidence that was before the jury, we choose to restate the evidence supporting Sharp's conviction in this opinion.

Quiroz identified Sharp as one of the burglars, and Sharp had told police that he and Johnson went to Quiroz's house in response to a message from Quiroz asking them to come there. Quiroz stated that he had asked Sharp and Johnson to come "help . . . . get into the house." Tr. p. 934. McKnight testified that Sharp and Johnson were in fact present in her

9

home on the day of the burglary. Sharp also told police officers that while they were at Quiroz's house Quiroz and Johnson discussed where the money was and where the police were.

Additional evidence established that Scott encountered four burglars in his home; one who fled out the kitchen door, and three who fled into the bedroom closet. Of the three men who remained in the bedroom closet, one was Quiroz, who is Hispanic, one was Layman, who is white, and the other was Johnson, who is black. After a police cruiser passed the school bus she was driving, Black testified that she saw a white male, who could not have been Layman, who had been shot in the leg at Scott's house, or Sharp, who is black, walking to the north and glancing back before he began running. Black's testimony about the location of this man is corroborative of Quiroz's statement that Sparks had served as the lookout during the burglary of Scott's house. A knife similar to the one that was missing from the knife block in Scott's kitchen was found to the south, in Campiti's backyard.

April McKeown was a teacher at Concord High School and had come to know Sharp while he was a student. McKeown developed a mentoring relationship with Sharp that endured after Sharp left school until the time of trial. Sharp was also known as "Ant." *Id.* at 990. Sharp had somehow obtained McKeown's cell phone number and used it regularly to text her. McKeown testified at trial that Sharp had texted her on the afternoon of October 3, 2012. Sharp sent a text to her stating, "Hey, can u pick me up??m i really need u . . .Jus got shot." Tr. p. 1001; Ex. 39. Sharp texted again later asking, "can you take me to the hospital please im beggin you." Tr. p. 1001; Ex. 39. McKeown testified that she texted

10

the reply, "Call 911. Im still at work. Where r u?" Tr. p. 1001; Ex. 39. Sharp texted the response, "nah, nah, forget it, I'll find a way." Tr. p. 1002. Sharp texted again, "its all badd… :(((. Its my time...Bye." Tr. p. 1002; Ex. 39. McKeown texted, "This is not funny!" Tr. p. 1002; Ex. 39. Sharp's next text to McKeown read, "Imm either dying today or going to jail i can jus fill [sic] it." Tr. p. 1006-07; Ex. 39. McKeown then texted, "Oh Anthony. What have u gotten yourself into." Tr. p. 1003; Ex. 39.

From this evidence and the reasonable inferences drawn therefrom, a reasonable juror could conclude that Sharp believed he was either going to die or go to jail because he participated in the burglary. Thus, Sharp's conviction rests on more than the testimony of a sole witness whose testimony is uncorroborated. To the extent Sharp points to testimony in the record to support his assertion that Quiroz's identification of Sharp was unreliable, this argument invites this Court to reweigh the evidence and reassess the credibility of the witnesses, a task we are forbidden to undertake. *Treadway*, 924 N.E.2d at 639. "The trier of fact is entitled to determine which version of the incident to credit." *Scott v. State*, 867 N.E.2d 690, 695 (Ind. Ct. App. 2007). "[I]t is precisely within the domain of the trier of fact to sift through conflicting accounts of events. Not only must the fact-finder determine whom to believe, but also what portions of conflicting testimony to believe." *Atwood v. State*, 905 N.E.2d 479, 484 (Ind. Ct. App. 2009) (quoting *In re J.L.T.*, 712 N.E.2d 7, 11 (Ind. Ct. App. 1999)). Sufficient evidence exists to support Sharp's conviction.

## II.

Sharp also challenges the application of the felony-murder statute to his conduct. We observe that Sharp's claim, i.e., that the evidence is insufficient to show it was

foreseeable that one of Sharp's co-perpetrators could die during the commission of the burglary, roughly equates to a claim "that the facts stated do not constitute an offense." Ind. Code § 35-34-1-4(a)(5) (1983). However, Sharp failed to file a motion to dismiss the charging information against him prior to trial. When a defendant charged with a felony seeks to have the charges against him dismissed for that reason, he must file a motion to dismiss no later than twenty days prior to the omnibus date. Ind. Code § 35-34-1-4. "Failure to make a timely challenge to an allegedly defective charging information results in waiver unless fundamental error has occurred." *Truax v. State*, 856 N.E.2d 116, 123 (Ind. Ct. App. 2006). Sharp does not make a claim that the charging information was drafted in such a way that he is entitled to relief under the fundamental error doctrine. As a consequence, his argument here appears to have been waived, because claims may not be made for the first time on appeal. "A defendant is limited to the grounds advanced at trial and may not raise a new ground for objection for the first time on appeal." *King v. State*, 799 N.E.2d 42, 49 (Ind. Ct. App. 2003).

Nevertheless, we have addressed claims notwithstanding waiver of the issue. For example, we have addressed waived claims that might have led to the dismissal of an charging information in the context of constitutional challenges, *Sewell v. State*, 973 N.E.2d 96, 101 (Ind. Ct. App. 2012), or in situations where our Supreme Court has sanctioned the retroactive application of a new statutory interpretation. *Lawrence v. State*, 665 N.E.2d 589, 592 (Ind. Ct. App. 1996). In this case, however, Sharp has not raised a constitutional argument, and does not suggest a retroactive application of a new statutory

12

interpretation.  Instead, Sharp asserts that his charged conduct should not fall within the definition of felony murder.

In *Sewell*, we stated the following before addressing the merits of the appellant's claims:

> We reiterate our warning to defendants that cases in which we have addressed the merits of the challenge notwithstanding the waiver, should not be viewed as an "invitation to neglect to file a motion to dismiss and then argue for the first time on appeal that the statute is unconstitutional."

973 N.E.2d at 101 (quoting *Price v. State*, 911 N.E.2d 716, 719 n.2 (Ind. Ct. App. 2009)). Thus, with that reminder, we address the merits of Sharp's claims.

Sharp attempts to distinguish precedent in an effort to remove the facts of his case from the application of that precedent, with particular emphasis on the possession of a weapon.  Sharp argues that none in the group had a weapon when the burglary of Scott's house occurred.  Assuming, *arguendo*, that Sharp did not use a weapon in the commission of the burglary, his argument fails nonetheless.

In *Palmer v. State*, 704 N.E.2d 124, 126 (Ind. 1999), our supreme court stated the following with respect to felony murder:

> The statutory language "kills another human being while committing" does not restrict the felony murder provision only to instances in which the felon is the killer, but may also apply equally when, in committing any of the designated felonies, the felon contributes to the death of any person.

Additionally, we have stated that when a defendant should have foreseen that the commission of the offense would likely create a situation exposing another to the danger of death at the hands of a nonparticipant in the felony and where a death does occur as foreseen, the creation of the dangerous situation is an "intermediary, secondary, or medium

13

in effecting or bringing about the death of the victim." *Sheckles*, 648 N.E.2d at 205. Therefore, the "foreseeability" of the death is not a *mens rea* of felony murder, but evidence a jury may use to find that the defendant's conduct "raised the foreseeable possibility" of death. *Palmer*, 704 N.E.2d at 126.

Quiroz, Layman, and Sparks knew and discussed before Sharp arrived that burglarizing occupied homes was hazardous. Further, they were aware of the possible dangers that even if Scott's house was unoccupied at the time, the burglary might be cut short by the return of the resident of the home or by the arrival of police officers. Sparks was posted as a lookout equipped with a cell phone to alert Quiroz in the event either of those situations came to pass. Their plans were interrupted instead by the presence of the homeowner after the burglars gained entry by kicking in the door to the house.

In *Exum*, we acknowledged that "[a] victim of a forcible felony or unlawful entry of or attack on his dwelling fighting back with deadly force is such a natural consequence that it has been justified by our State's legislature. *See* Ind. Code § 35-41-3-2. Furthermore, our State's constitution gives the people a right to bear arms 'for the defense of themselves.' Ind. Const. Art. I § 32." 812 N.E.2d at 208. As in *Exum*, we conclude that the evidence is sufficient to show that Sharp should have reasonably foreseen that the victim's act of self-defense or defense of his dwelling could occur. This is true even where the defendant is not armed and may have left prior to the shooting. *See id.* (felony murder conviction sustained where unarmed defendant may have fled prior to shooting resulting in death of co-perpetrator).

14

To the extent Sharp argues that a felony murder conviction should require proof that a defendant was armed or that he knew that his co-perpetrators were armed, we disagree with this contention. We have upheld felony murder convictions where the perpetrators were unarmed, but the stress of the crimes committed resulted in someone's death. *See Booker v. State*, 270 Ind. 498, 502-03, 386 N.E.2d 1198, 1201 (1979) (affirming felony murder conviction where victim died after unarmed defendants committed the robbery); *Lichti v. State*, 827 N.E.2d 82, 93 (Ind. Ct. App. 2005) (affirming felony murder conviction where victim's cause of death was not established and no evidence defendant was armed), *aff'd in part and vacated in part by Lichti v. State*, 835 N.E.2d 478 (Ind. 2005) (remanding for a new sentencing hearing, but summarily affirming in all other respects).

In this case, although there is no connection between the knife-found in Campiti's yard along the path used by Sharp to flee from Scott's home-and the injuries inflicted upon Johnson leading to his death, no such connection is required to sustain Sharp's felony-murder conviction. Following established precedent as we must, we find no error in the application of the felony-murder statute to the facts of this case.

III.

Sharp contends that his sentence is inappropriate in light of the nature of the offense and the character of the offender. The Indiana Constitution commits independent appellate review and revision of sentences through Article 7, §6, authority implemented through Appellate Rule 7(B). *Anglemyer v. State*, 868 N.E.2d 482, 491 (Ind. 2007), *clarified on reh'g on other grounds*, 875 N.E.2d 218 (Ind. 2007). The Rule provides that a court "may revise a sentence authorized by statute if, after due consideration of the trial court's

15

decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." *Id.* (quoting Ind. Appellate Rule 7(B)). "The burden is on the defendant to persuade" the appellate court that his or her sentence is inappropriate. *Reid v. State*, 876 N.E.2d 1114, 1116 (Ind. 2007) (citing *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006)). The principal role of appellate review of sentences under Appellate Rule 7(B) is to attempt to leaven the outliers. *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008).

When a defendant is convicted of felony murder, the defendant faces a sentencing range of forty-five years to sixty-five years, with an advisory sentence of fifty-five years. Ind. Code § 35-50-2-3 (2007). Sharp was convicted of felony murder and was sentenced to fifty-five years executed, with no time suspended to probation. While the nature of the offense justifies the total length of the sentence Sharp received, Sharp's youth warrants a period of probation as a part of his sentence.

The record reflects that this is the first offense for which Sharp was charged as an adult. As a juvenile, Sharp's record consisted of an adjudication for theft, which was handled by informal supervision. Of the allegations handled by formal supervision, those three were for the illegal consumption of an alcoholic beverage, with one having the additional allegation that he was in possession of marijuana. Although not a favorable reflection upon Sharp's character, these offenses were not particularly serious and were unrelated to the murder in this case. *See Wooley v. State*, 716 N.E.2d 919, 929 n. 4 (Ind. 1999) (recognizing significance of criminal history "varies based on the gravity, nature and number of prior offenses as they relate to the current offense.").

16

Additionally, although the record reflects that Sharp has a history of marijuana usage, which the trial court found as an aggravating circumstance, where youthful offenders are the victims of addiction, this fact is not necessarily indicative of a bad character. *See Brown v. State*, 10 N.E.3d 1, 6 (Ind. 2014). Instead, a youthful offender's difficult upbringing, including early drug and alcohol use, can "serve to diminish the juvenile's culpability and weigh in favor of a lesser sentence." *Id.* (citing *Graham v. Florida*, 560 U.S. 48, 92, 130 S. Ct. 2011, 2040 (2010), Roberts, C.J., concurring in the judgment). Here, Sharp was just three months past turning eighteen years of age at the time of the crime. Although technically an adult, he sought out the assistance of one of his high school teachers after the crime, further indicative of his continued youthful perspective. That he was socializing with the others involved prior to setting out to commit the previously planned burglary, and had used marijuana on the day of the offense, is indicative of his continued enhanced susceptibility to peer pressure. Sharp's level of immaturity was underscored by his expressed desire to play college football someday, despite not yet completing high school. *See Graham*, 560 U.S. at 92, 130 S. Ct. at 2040, Roberts, C.J. concurring in judgment (youthful defendant's stated desire to "do whatever it takes to get to the NFL" underscores his immaturity).

Article 1, §18 of the Indiana Constitution explicitly provides that our penal code is founded "on the principles of reformation, and not of vindictive justice." Further, "notwithstanding society's valid concerns with protecting itself and providing retribution for serious crimes, the State criminal justice system must afford an opportunity for rehabilitation where reasonably possible." *Fointno v. State*, 487 N.E.2d 140, 144 (Ind.

1986). As recently expressed by our Supreme Court when addressing the issue of sentencing youthful offenders, a reduction of the sentence was necessary because the sentence imposed essentially "means [a] denial of hope; it means that good behavior and character improvement are immaterial; it means that whatever the future might hold in store for the mind and spirit of the [juvenile] convict, he will remain in prison the rest of his days." *Brown*, 10 N.E.3d at 8 (citing *Graham*, 560 U.S, at 70, 130 S. Ct. 2011, quoting *Naovarath v. State*, 105 Nev. 525, 779 P.2d 944, 944 (1989)).

Lastly, we note that after Quiroz, one of the original planners of the burglary, pled guilty, the trial court sentenced him to the fifty-five-year advisory sentence and suspended ten years to probation. However, the trial court sentenced Sharp to fifty-five years with no time suspended. From our view, we can detect no difference in the relative culpability of the defendants and their respective roles in this crime. The only patent distinction we note is that Quiroz, who was recognized by the homeowner and apprehended by police, pleaded guilty, and Sharp, who turned himself in the day after the crime, exercised his constitutional right to a jury trial. Fundamental principles of due process prohibit the imposition of a more severe sentence when a defendant has chosen to stand trial rather than to plead guilty. *Walker v. State*, 454 N.E.2d 425, 429 (Ind. Ct. App. 1983).

We acknowledge that in situations such as this, where the defendant receives the advisory sentence, his burden when challenging his sentence on appeal is even greater. "Since the advisory sentence is the starting point our General Assembly has selected as an appropriate sentence for the crime committed, the defendant bears a particularly heavy burden in persuading us that his sentence is inappropriate when the trial court imposes the

advisory sentence." *Fernbach v. State*, 954 N.E.2d 1080, 1089 (Ind. Ct. App. 2011). We believe that Sharp has met this burden and remand this matter to the trial court with instructions.

Based on the foregoing, we conclude that Sharp's sentence is inappropriate. Although the trial court was within its discretion in its sentencing choice, our "collective sense of what is appropriate" is a sentence similar to that imposed for Quiroz. *See Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008). The trial court is instructed to vacate Sharp's previously imposed sentence, and to impose a sentence of fifty-five years with forty-five years executed and ten years suspended to probation.

## CONCLUSION

In summary, the evidence is sufficient to support Sharp's conviction for felony murder. The application of the felony-murder statute to the facts of this case is proper under existing precedent. However, Sharp has met his burden of establishing that his sentence is inappropriate in light of the nature of the offense and his character. We therefore remand this matter to the trial court to vacate its previously imposed sentence, and to enter an order imposing a sentence of fifty-five years with forty-five years executed and ten years suspended to probation.

Affirmed in part, reversed in part, and remanded with instructions.

BROWN, J., and PYLE, J., concur.